**UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,**

v.

**KAIYO MARU NO. 53, with its fishing gear, furniture, appurtenances, stores, fish, cargo, et al., Defendants-Appellees, Cross-Appellants.**

Nos. 81–3273, 81–3293.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 11, 1982.

Decided Feb. 22, 1983.

As Amended May 23, 1983.

John H. Bradbury, Bradbury, Bliss & Riordan, Anchorage, Alaska, for defendants-appellants.

D.E. Dennis, Asst. U.S. Atty., Anchorage, Alaska, Donald A. Carr, Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Before WRIGHT, SKOPIL, and ALARCON, Circuit Judges.

SKOPIL, Circuit Judge:

## INTRODUCTION

The Japanese stern trawler KAIYO MARU NO. 53 ("KAIYO") was seized for failing to log a large quantity of fish and for taking prohibited species in violation of the Fishery Conservation and Management Act ("FCMA" or "the Act"), 16 U.S.C. §§ 1821, 1857. The district court imposed a $450,000 penalty, rejecting the government's contention that the penalty must equal the vessel's full value. The district court also rejected the vessel owners' ("claimants") arguments that the Coast Guard's search and seizure of the vessel violated the fourth and fifth amendments. The government appeals the district court's ruling on the forfeiture issue. The vessel's owners cross-appeal, seeking review of their fourth and fifth amendment arguments.

## FACTS

In the spring of 1979 the KAIYO began fishing in the waters off the remote western part of the Aleutian Islands of Alaska. It was fishing by permit in the Fishery Conservation Zone ("FCZ"), the 197 mile-wide band of ocean beyond the territorial waters of the states in which federal fisheries management jurisdiction prevails.[1] Early on June 2, the vessel changed from its assigned fishing area to another area which was available to it upon notice given to the Coast Guard. The required shift message was transmitted.[2]

Later that morning the Coast Guard Cutter STORIS, while on routine patrol, sighted the KAIYO with its gear down fishing within the FCZ near Kiska Island. The STORIS requested information regarding the KAIYO from its Juneau office and was erroneously informed that the KAIYO had not made the required shift message. The commanding officer of the STORIS decided to make a routine boarding of the KAIYO to inspect her documents and catch, and determine if she was fishing in the proper area.

Without a warrant or probable cause to believe that wrongdoing was or had been occurring,[3] a party of Coast Guard officers boarded the KAIYO. Examination of the vessel's radio log indicated that the requisite shift message had been sent. A comparison of the KAIYO's catch log with the amount of frozen fish in the vessel's holds, however, indicated significant underreporting. A large quantity of halibut, a species prohibited to all foreign fishermen, was also discovered.

A systematic search was undertaken. Results of the search indicated serious violations of the FCMA. The STORIS requested permission from the Juneau office to seize the vessel. The request was transmitted to the Coast Guard Commandant in Washington, D.C., who approved the seizure. The vessel was seized and escorted to Kodiak, Alaska.

The United States' complaint for forfeiture was filed on June 11 and the vessel was arrested by the United States Marshal the following day.[4] Following a court hearing, the catch[5] was ordered sold by the United States Marshal, and the vessel was released on security pending the outcome of forfeiture proceedings. Shortly after release, the KAIYO's fishing permit was revoked and the vessel returned to Japan.

Trial was held in May 1980, after which the district court concluded that the KAIYO had violated the FCMA and assessed a civil penalty of $450,000.

The United States appeals from the district court's assessment of a civil penalty in an amount less than the entire value of the vessel. The claimants appeal the district court's rejection of their arguments regarding statutory and constitutional infirmities of the search, seizure and arrest of the

1. *See* Fishery Conservation and Management Act of 1976, 16 U.S.C. § 1801 *et seq.* (hereinafter FCMA). The FCMA defines the fishery conservation zone at section 1811. Exclusive fishery management by the United States, in the manner provided for by the FCMA, is claimed over "(1) All fish within the fishery conservation zone. (2) All anadromous species throughout the migratory range of each such species beyond the fishery conservation zone ... (3) All Continental Shelf fishery resources beyond the fishery conservation zone." 16 U.S.C. § 1812.

2. *See* 50 C.F.R. § 611.4(a)(4) (1979).

3. Despite the inconsistency between the KAIYO's location and the erroneous information supplied the STORIS by the Coast Guard Juneau office regarding the shift message the government concedes that any suspicion aroused did not rise to the level of probable cause to suspect wrongdoing.

4. Even though the KAIYO was in the custody of the United States, it was necessary as a procedural matter to have the vessel "arrested" in order for the district court to have jurisdiction over the vessel for purposes of the government's forfeiture claim. *See* Fed.R.Civ.P. C (Supplemental Rules for Certain Admiralty and Maritime claims).

5. The catch was inventoried and sold pursuant to the district court's order. The inventory disclosed more than 11 tons of halibut, an entirely prohibited species, and underreporting or misreporting of permissible species of 130.5 metric tons.

vessel. They urge that warrants should have been obtained before the search and seizure of the vessel and that a hearing should have been held before the ship was arrested.

## ISSUES

1. Does the FCMA authorize warrantless searches and seizures?

2. Do warrantless searches and seizures under the FCMA violate the fourth amendment?

3. Did the arrest of the vessel by the government pursuant to Fed.R.Civ.P. C (Supplemental Rules for Certain Admiralty and Maritime Claims) violate the due process clause of the fifth amendment?

4. Did the district court have discretion to impose a monetary forfeiture of less than the total value of the vessel?

## DISCUSSION

1. Statutory Authorization.

The FCMA provides that:

Any officer who is authorized by the Secretary [of Commerce], the Secretary [of Transportation], or the head of any Federal or State agency which has entered into an agreement ... to enforce the provisions of this chapter may—

(1) with or without a warrant or other process—

\* \* \* \* \* \*

(B) board, and search or inspect, any fishing vessel which is subject to the provisions of this chapter;

(C) seize any fishing vessel ... used or employed in, or with respect to which it reasonably appears that such ves-

sel was used or employed in, the violation of any provision of this chapter; and

(D) seize any fish ... taken or retained in violation of any provision of this chapter; and

(E) seize any other evidence related to any violation of any provision of this chapter;

(2) execute any warrant or other process issued by any court. . . .

16 U.S.C. § 1861(b). Claimants argue that the "with or without" language of the Act contemplates the use of warrants when practicable and yet affords the authority to proceed without them if exigent or other appropriate circumstances exist. Unfortunately, the legislative history is silent on the matter. Based on a reading of the Act as a whole and considering the objectives of the Act and the circumstances under which it was enacted, we conclude that the above quoted provisions of the FCMA authorize warrantless searches and seizures whether or not obtaining a warrant is practicable or exigent circumstances exist.

The FCMA was enacted at a time when overfishing, particularly by foreign fishermen, was commonplace. Commercial and recreational fisheries for a number of species were threatened because of the inability to effectively regulate the harvest beyond the three mile jurisdictional limits.[6] The states exercised some control over domestic fishermen beyond three miles but foreign fishermen were essentially unregulated because of meager federal efforts. The failure of the federal attempts to manage ocean fisheries by treaty and later by the Bartlett Act[7] led to a resource problem of crisis proportions.[8] It was in this crisis atmosphere that the FCMA was enacted.[9]

---

6. *See* Magnuson, the Fishery Conservation and Management Act of 1976: First Step Toward Improved Management of Marine Fisheries, 52 Wash.L.Rev. 427, 431–433 (1977). *See also* S.Rep. No. 94–416, 94th Cong., 1st Sess. (1975) *reprinted in* A Legislative History of the Fishery Conservation and Management Act, Senate Comm. on Commerce, 94th Cong., 2d Sess., 666 (Comm. Print 1976).

7. 16 U.S.C. § 1081, 78 Stat. 194 (repealed 1976).

8. Congress recognized the failure of past federal efforts and the deleterious effects on living ocean resources in the FCMA section entitled "Findings, purposes and policy." *See* 16 U.S.C. § 1801.

9. The extent of the problem is illustrated by the fact that over 36 fishery protection bills were

The circumstances of its creation supports our view that Congress intended to authorize the most potent possible enforcement procedures.

Our interpretation of section 1861 is also consistent with the thrust of the FCMA as a whole. The Act requires that foreign nations and the owner or operator of a vessel fishing in the FCZ allow official United States observers aboard the vessel,[10] and to agree to permit any authorized officer to board and search or inspect the vessel.[11] The Act requires any permit issued be prominently displayed in the wheelhouse and requires that the permit be shown upon request to any officer authorized to enforce the Act.[12] Moreover, it is a criminal violation to refuse to allow any authorized officer to board a fishing vessel for the purpose of conducting any search or inspection in connection with its enforcement.[13] Regulations implementing the Act also require the keeping of extensive records and log books and authorize the inspection of these log books at any time. Regulations also require that foreign vessels keep the Coast Guard constantly apprised of their location and activities.[14] We agree with the district court that these stringent requirements support an interpretation of the Act that authorizes warrantless searches and seizures.

Claimant's interpretation reads too much into the language of section 1861. If Congress had intended warrantless searches to proceed only when there were "exigent" or "other appropriate" circumstances, it would have said so. Congress had no difficulty in expressing limitations on warrantless arrests of persons by requiring "reasonable cause to believe such person has committed an act" prohibited by the FCMA. *See* 16 U.S.C. § 1861(b)(1)(A).

Congress was aware of the physical difficulties of obtaining a warrant at sea. We agree with the district court that the FCMA contemplates routine warrantless inspections or searches and seizures as part of the enforcement scheme of the Act.

### 2. Fourth Amendment.

The fourth amendment protects individuals from "unreasonable" searches and seizures. Its purpose is to impose a standard of "reasonableness" upon the exercise of discretion by government officials in order "to safeguard the privacy and security of individuals against arbitrary invasions...." *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978), *quoting Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967).

### a. Search

The fourth amendment applies to administrative inspections of private commercial property. *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

---

introduced in the 94th Congress. *See generally* Federal Fisheries Management, A Guidebook to the Fishery Conservation and Management Act (J. Jacobson and K. Davis eds. 1983).

**10.** 16 U.S.C. § 1821(c)(2)(D).

**11.** The FCMA requires a relationship between the United States government, a foreign fishing nation, and that nation's fishing vessel owners or operators that is governed by agreement between the parties. *See* 16 U.S.C. § 1821. These "governing international fishery agreements" include a number of concessions by the foreign parties seeking fishing permits including consent to routine searches by authorized officers of the United States. 16 U.S.C. § 1821(c)(2)(A)(i).

**12.** 16 U.S.C. § 1821(c)(2)(B). Claimants argue that the various provisions regarding "authorized officers" refer to officers armed with search warrants. We disagree. Section 1861(b) says that authorization of officers is by the Secretary of Commerce or Transportation (the department in which the Coast Guard is operating), not by the courts by virtue of issuance of a warrant. We understand section 1861 to mean that an "authorized officer" is one designated by the appropriate government agency to enforce the provisions of the Act. The implementing regulations are in accordance with our interpretation. *See* 50 C.F.R. §. 611.2(e).

**13.** 16 U.S.C. § 1857(1)(D).

**14.** 50 C.F.R. § 611.9.

However, "unlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment, legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment." *Donovan v. Dewey,* 452 U.S. 594, 598, 101 S.Ct. 2534, 2537, 69 L.Ed.2d 262 (1981) (citations omitted). The greater tolerance for warrantless inspections of commercial property reflects the different sanctity accorded an individual's expectation of privacy in commercial property compared to the privacy interest in a home. *Id.* at 598–99, 101 S.Ct. at 2537. *See also United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972).

■ Congress has broad authority to regulate interstate commerce, including the imposition of inspection programs on private business property. *Donovan,* 452 U.S. at 599, 101 S.Ct. at 2537. Whether a regulatory scheme that includes warrantless inspections is reasonable under the fourth amendment is determined on a case-by-case basis. *Marshall,* 436 U.S. at 321, 98 S.Ct. at 1824 (1978). Reasonableness depends on the specific enforcement needs and privacy guarantees of each statute. *Id.*

■ Warrantless inspections of commercial property may be unreasonable if they are unnecessary to further important federal interests, *Donovan,* 452 U.S. at 599, 101 S.Ct. at 2537, or if their occurrence is so random, infrequent, or unpredictable that the owner has no real expectation that property will from time to time be inspected by government officials. *Id. See also Marshall,* 436 U.S. at 323, 98 S.Ct. at 1825. A warrant may be required where the legislative or regulatory scheme is so unrestrictive that business owners are exposed to "the unbridled discretion [of] executive and administrative officers," *Marshall,* 436 U.S. at 323, 98 S.Ct. at 1825, without the assurance that "reasonable legislative or administrative standards for conducting an

... inspection are satisfied." *Camara v. Municipal Court,* 387 U.S. at 538, 87 S.Ct. at 1735.

The Supreme Court has recognized that the regularity provided by a warrant is unnecessary under certain inspection schemes. *See United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). The Court summarized the extent of the warrant exception when it said:

> These decisions make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.

*Donovan,* 452 U.S. at 600, 101 S.Ct. at 2538.

■ Applying this analysis to the case before us we conclude that the warrantless inspections authorized by the Fishery Conservation and Management Act do not offend the fourth amendment. There is strong federal interest in protecting natural resources within the FCZ. The Act was adopted upon a clear showing that the supply of foodfish was dangerously depleted. Congress was aware that an important national asset was at stake and that strong measures were necessary.

■ Congress reasonably concluded that warrantless searches [15] are necessary to further the regulatory scheme presented under the FCMA. First, the physical difficulty of obtaining and presenting a search warrant is overwhelming. Second, the nature of the industry prevents procurement of a warrant for a specific vessel in advance. The Coast Guard cannot tell when or where they will encounter a vessel fishing in the FCZ. Fishing vessels are assigned to large areas,

---

**15.** The question of warrants aside, the need for periodic inspections of foreign fishing vessels was clearly decided by Congress. We defer to their decision that periodic inspections should be a part of the FCMA enforcement scheme.

they are frequently authorized to move from area to area, and they move in and out of the FCZ without restriction. Even if the Coast Guard knew the location of a specific vessel on a specific date, the weather would often frustrate boarding plans. These difficulties are complicated by the fact that an enforcement vessel might be at sea for weeks. The logistical problems in establishing a successful inspection program requiring warrants are insurmountable.[16] If there is to be a successful inspection program at all, it must be a warrantless one.

■ Here, as in *Donovan v. Dewey*, the only real issue before us is "whether the statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant." 452 U.S. at 603, 101 S.Ct. 2539. Warrantless searches of commercial property are permissible when authorized by statute and reasonably necessary to protect important federal interests, where the benefits of the warrant process would be minimal because the inspection is made in "the context of a regulatory inspection system of business premises which is carefully limited in time, place, and scope." *United States v. Biswell*, 406 U.S. at 315, 92 S.Ct. at 1596 (1972).

■ We conclude that the statute and enforcement policy of the Coast Guard[17] sufficiently limit the discretion of the inspecting officers in the field as to render warrantless FCMA inspections "reasonable" within the meaning of the fourth amendment. First, enforcement is limited to officers authorized by the Secretaries of Commerce and Transportation. A fishing vessel operator is subject to search by only a limited number of government officers. Second, warrantless inspections are limited to specified fishing vessels. The Coast Guard has specifically limited its boardings to foreign fishing vessels actually engaged in fishing activities or otherwise within the FCZ after notifying the Coast Guard of intent to commence fishing activities and before having "checked out."[18] Searches are thus limited to those vessels actively involved in the harvest of fish.[19] Third, the Coast Guard has adopted standards for frequency of contact and inspection of foreign fishing vessels. In each "major statistical area," all fishing or fish processing vessels requiring an FCMA permit are to be boarded once every three months. For each fish processing vessel that requires an FCMA permit and operates with assigned catcher boats, 25 percent of the catcher boats are to be boarded once every three months.[20] The inspections are not so random or infrequent that the vessel owner has no real expectation that his property will from time to time be inspected by government officials.[21]

---

**16.** Claimants argue that a warrant could have been obtained in this case. We think it irrelevant that in isolated instances it is possible, by some combination of helicopter and boat travel, to procure a warrant. The validity of a warrantless inspection scheme is judged by its necessity for success of an enforcement plan *on the whole.*

**17.** Claimants argue that the enforcement policy documented by the Coast Guard Operations Order 201–(YR) is merely an "internal document" and should not be considered in determining whether an inspection program is sufficiently limited to qualify as a constitutionally adequate substitute for a warrant. We agree with the Second Circuit that established policy of an agency limiting the discretion of inspecting officers may be considered as well as limitations set forth in the authorizing statute. *See United States ex rel. Terraciano v. Montanya,* 493 F.2d 682 (2d Cir.1974) (where statute did not limit inspection to business hours it was sufficient that Health Department established policy did). *Accord, People v. Curco Drugs, Inc.,* 76 Misc.2d 222, 350 N.Y.S.2d 74 (1973).

**18.** Operation Order CCGSEVENTEEN No. 201–(YR) D–I–B–1.

**19.** Foreign vessels taking fish within the FCZ are exempt from inspection by Coast Guard policy if they are "(a) conducting a directed fishery for highly migratory species; or (b) taking fish during the course of scientific research." Coast Guard Operations Order 201–(YR) D–I–C–1. Since "highly migratory species" are not federally managed under the FCMA the exemption for vessels targeting them evinces an effort to tailor the enforcement inspection to the contours of the Act. The exemption for scientific research vessels is apparently an attempt to minimize government intrusion when the take of fish is not likely to reach a level that would significantly affect the stocks.

**20.** Coast Guard Operations Order 201–(YR) A–I–2.

**21.** We recognize that the standards established by the Coast Guard may not always be met

Finally, foreign fishing in the FCZ has become such a highly regulated enterprise that, given the other limitations of the inspection program, a warrant is unnecessary. As the Supreme Court has said, "it is the pervasiveness and regularity of the federal regulation that ultimately determines whether a warrant is necessary to render an inspection program reasonable under the Fourth Amendment." *Donovan,* 452 U.S. at 606, 101 S.Ct. at 2542. *See Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *United States v. Raub,* 637 F.2d 1205 (9th Cir.), *cert. denied,* 449 U.S. 922, 101 S.Ct. 322, 66 L.Ed.2d 150 (1980); *United States v. Tsuda Maru,* 470 F.Supp. 1223 (D.Alaska 1979) (warrantless searches under FCMA constitutional given the pervasive and historical regulation of fishing). Nearly every aspect of the harvest of fish in the FCZ by foreign fishermen is controlled by the FCMA and its implementing regulations.[22] *See generally* 16 U.S.C. §§ 1821–25 *and* 50 C.F.R. Part 611 (Foreign Fishing). Vessel owners and operators "cannot help but be aware that [the vessel] will be subject to periodic inspections undertaken for specific purposes." *Donovan,* 452 U.S. at 600, 101 S.Ct. at 2538. Accordingly, we hold that foreign fishing under the FCMA is a pervasively regulated industry and that, with the limitations on the inspection program set out in the statute and by Coast Guard policy, no warrant is necessary for periodic boardings of foreign fishing vessels to determine compliance with the Act and applicable fishing regulations.[23]

b. *Seizures*

■ Because the fourth amendment protects against warrantless seizures as well as searches, we must consider the validity of the warrantless seizure of the KAI-YO. Seizures, as well as searches, when conducted without the protections afforded by the warrant process, are *per se* unreasonable under the fourth amendment—subject only to a few exceptions. *United States v. McCormick,* 502 F.2d 281 (9th Cir. 1974).

In *McCormick* an automobile that had been used in a counterfeiting operation was seized without a warrant under authority of a federal forfeiture statute.[24] We recognized that, despite the forfeiture statute, the seizure could not be valid unless it fit within one of the recognized exceptions to the warrant requirement. No exception applied. The "automobile exception," first established in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), did not apply because there were no exigent circumstances that justified moving quickly to seize. The automobile in *McCormick* had been sitting unused in the defendant's driveway for over two months. We held the seizure invalid.

We distinguished *McCormick* in *United States v. Kimak,* 624 F.2d 903 (9th Cir. 1980). In *Kimak* the vehicle was still actively being used in the illegal enterprise,

with respect to individual vessels. We nonetheless view the standards as a limitation on the discretion of enforcement officers.

22. Each foreign fishing permit is issued on the express condition that the vessel operator submit to fishery enforcement inspections authorized by the Act. While our holding does not rely on a "consent to search" or "waiver of rights" theory, we think the "consent" is significant as evidence that vessel owners and operators are on notice that periodic inspections can be expected.

23. Implicit in the FCMA and our holding is the limitation that warrantless fishery enforcement inspections are authorized only for those areas of a vessel necessary to assure compliance with the Act. This would exclude living quarters

and the crew's personal property where the expectation of privacy is entitled to more weight. *United States v. Tsuda Maru,* 470 F.Supp. 1223, 1229 (D.Alaska 1979). Any impression on the part of the Coast Guard that there are no restrictions on fishery enforcement inspections is in error.

24. 49 U.S.C. § 782 provides in part that "[a]ny ... vehicle ... which has been or is being used in violation of any provision of section 781 of this title, or in, upon, or by means of which any violation of said section has taken or is taking place, shall be seized and forfeited...."

49 U.S.C. § 781 provides in part: "(a) It shall be unlawful (1) to transport, carry, or convey any contraband article in, upon, or by means of any vessel, vehicle, or aircraft...."

and exigent circumstances were presented because the site of the seizure was along a public highway. We held that the "automobile exception" applied. *Id.* at 905.

■ The *Carroll* exception extends to vessels as well as automobiles and other movable vehicles as long as there is probable cause and circumstances are present that make it impractical to require seizing officers to obtain warrants prior to search or seizure. *Carroll,* 267 U.S. at 153–54, 45 S.Ct. at 285. The seizure of the KAIYO MARU satisfies the requirements of the exception. The Coast Guard officers knew that the KAIYO was being used in the illegal harvest and retention of fish. To require the Coast Guard officers to remain aboard a vessel among potentially hostile occupants while other officers undertake a sometimes long and always hazardous journey to the nearest judicial officer would be too much to ask.[25] Under such circumstances a warrantless seizure under authority of the FCMA forfeiture provision is "reasonable" under the fourth amendment.

3. Arrest Pursuant to Fed.R.Civ.P. C.

The government initiated forfeiture proceedings while the KAIYO was being held in Kodiak. In order for the court to have jurisdiction over the vessel *in rem* it was necessary for the United States Marshal to "arrest" the vessel pursuant to Fed.R.Civ.P. C (Supplemental Rules for Certain Admiralty and Maritime Claims), which provides:

(3) Process.

Upon the filing of the complaint the clerk shall forthwith issue a warrant for the arrest of the vessel or other property . . . and deliver it to the marshal for service.

(4) Notice.

No notice other than the execution of the process is required . . . .

Claimants argue that this procedure, which requires no pre-arrest notice or hearing violates their fifth amendment rights to due process. We disagree.

In *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), the Supreme Court recognized that an exception has been carved out from the general due process requirements of notice and a hearing. In limited circumstances, summary seizure of property, without an opportunity for a prior hearing and without pre-seizure judicial participation, is constitutionally permissible. *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. at 678–79, 94 S.Ct. at 2089. Such circumstances are those in which:

First, . . . the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Fuentes v. Shevin,* 407 U.S. 67 at 91, 92 S.Ct. 1983 at 1999, 32 L.Ed.2d 556 (1972).

*Calero-Toledo* involved a pleasure yacht which was seized pursuant to Puerto Rican statutes providing for forfeiture of vessels used for unlawful purposes. Appellees leased the yacht to Puerto Rican residents who used it for a drug smuggling operation about which appellees knew nothing. The yacht was seized without notice or pre-seizure hearing and made subject to forfeiture to the Commonwealth of Puerto Rico.

The Supreme Court recognized that the seizure was necessary to foster the public interest in preventing continued illegal use of property and in enforcing sanctions for past criminal activity. The Court observed that the seizure was initiated by government officials rather than self-interested private parties. The need for very prompt

---

25. It was stipulated at trial that Fed.R.Crim.P. 41 authorizes application for warrants by radio, a means available to the Coast Guard in this case. The authority under Rule 41 is clearly limited to searches and seizures in the criminal context. Fed.R.Crim.P. 41(b). The seizure of the KAIYO MARU was purely a civil matter. The stipulation at trial was based on an erroneous legal assumption.

action was present because the vessel could have been moved, concealed or destroyed if advance warning of confiscation were given.

Claimants argue that here the need for prompt action did not exist because the vessel was already in the custody of the government. We agree, but we hold the arrest of the KAIYO under Fed.R.Civ.P. C did not deprive claimants of due process. The deprivation of claimant's property occurred when the vessel was seized at sea and held as part of the ongoing investigation for violations of the FCMA. We have held that seizure was proper.[26] The shoreside arrest of the vessel under Fed.R.Civ.P. C did nothing to further deprive claimants of their property. The arrest was a formality to establish jurisdiction *in rem* so that forfeiture could be pursued. In the limited circumstances presented by this case, where property is already properly in the government's custody, arrest of the property under Fed.R.Civ.P. C does not offend due process because no deprivation of property is occasioned by the arrest.[27]

4. Vessel Forfeiture.

The FCMA provides that

Any fishing vessel (including its fishing gear, furniture, appurtenances, stores, and cargo) used, and any fish taken or retained, in any manner, in connection with or as a result of the commission of any act prohibited by section 1857 . . . shall be subject to forfeiture to the United States. *All or part of such vessel may, and all such fish shall,* be forfeited to the United States pursuant to a civil proceeding under this section.

16 U.S.C. § 1860(a) (emphasis added).

The district court concluded that it had discretion to order forfeiture of all or part of the vessel. The court also concluded that it had authority to impose a monetary penalty in lieu of physical forfeiture. It recognized that forfeiture of an illegal catch was mandatory. Accordingly, the district court assessed a $450,000 penalty against the vessel and ordered the entire catch forfeited to the United States.[28]

The government contends that the district court has no discretion to impose less than a complete forfeiture of the vessel. It argues that the court, upon finding the violations occurred, should have entered judgment for forfeiture of the entire vessel or its monetary equivalent. The government maintains that claimants' recourse from any harsh aspect of the forfeiture would be a petition for remission or mitigation lodged with the Secretary of Commerce pursuant to 16 U.S.C. § 1860(c) and 19 U.S.C. § 1618.[29]

---

**26.** Claimants' fifth amendment arguments regarding the seizure of the vessel at sea are adequately answered by the exception recognized in *Calero-Toledo*. First, the seizure was necessary to further important government interests. Second, the seizure was initiated by government officials. Finally, the Coast Guard should not be required to leave a vessel after finding serious violations of the FCMA pending notice and a hearing at which the vessel owners can contest a seizure. Clearly, prompt action was required.

The *Calero-Toledo* exception does not justify eliminating a hearing altogether, but only postponing it until after the seizure. In this case a hearing was held within 24 hours of claimants' first appearance by counsel, sufficiently prompt to satisfy due process requirements.

**27.** We limit our holding to the particular circumstances of this case. We intimate nothing regarding arrests initiated by private parties, whether the property is or is not already in the custody of the government.

**28.** *United States v. KAIYO MARU NO. 53,* 503 F.Supp. 1075, 1090 (1980).

**29.** 16 U.S.C. § 1860(c) provides that

[t]he provisions of the customs laws relating to—

(1) the disposition of forfeited property,

(2) the proceeds from the sale of forfeited property,

(3) the remission or mitigation of forfeitures, and

(4) the compromise of claims,

shall apply to any forfeiture ordered. . . .

Section 1618 of the enforcement provisions of the customs laws provides that

[w]henever any person interested in any vessel . . . who has incurred . . . any fine or penalty . . . files . . . a petition for the remission or mitigation of such fine, penalty, or forfeiture, the Secretary . . . if he finds that such fine, penalty, or forfeiture was incurred without willful negligence or without any intention on the part of the petitioner . . . to violate the law, or finds the existence of such

The government's interpretation is based on its understanding that the FCMA was intended to carry forward the forfeiture provisions of the Bartlett Act, 16 U.S.C. § 1081, 78 Stat. 194 (repealed 1976). The Bartlett Act, an early and limited attempt to control foreign fishing,[30] had mandatory forfeiture provisions.[31] The government contends that the Bartlett Act forfeiture provisions were intended to survive that Act's repeal when Congress enacted the FCMA. We disagree.

The FCMA forfeiture provisions are significantly different from those of the Bartlett Act. The Bartlett Act's administrative forfeiture option is absent from the FCMA.[32] All forfeitures under the FCMA, whether for catch, vessel, or gear, now require judicial intervention.[33] More important, the "all or part" language of the FCMA is not found in the Bartlett Act, and Congress would not have included this language if it wanted to duplicate the forfeiture provisions of the Bartlett Act.[34]

■ The district court correctly concluded that it had discretion to impose forfeiture of less than the whole vessel or its monetary equivalent.[35] The Secretary of Commerce then has the option, under section 1860(c), of mitigating the effect of the forfeiture ordered.

Our interpretation of section 1860 does not deprive the Secretary of the means to impose harsh sanctions when the circumstances warrant. The Secretary has ample authority to stiffen the consequences of illegal fishing by resort to administratively imposed permit sanctions and fines.

## CONCLUSION

The search of the KAIYO MARU falls within the exception to the warrant requirement carved out for administrative searches in pervasively regulated industries. The seizure of the vessel was justified under the *Carroll* exception to the warrant requirement. The seizure did not violate due process requirements because it was initiated by the government, was necessary to secure important government interests, and there was a need for prompt action. The arrest of the vessel under Fed.R.Civ.P. C did not violate due process because the arrest did not deprive the claimants of any property. The district court has the discretion under the FCMA to impose forfeiture of less than the whole vessel or its value.

The district court is AFFIRMED.

---

mitigation of such fine, penalty, or forfeiture, may remit or mitigate the same upon such terms and conditions as he deems reasonable and just....
19 U.S.C. § 1618.

**30.** *See* Fidell, *Ten Years Under the Bartlett Act: A Status Report on the Prohibition on Foreign Fishing,* 54 B.U.L.Rev. 703 (1974) (citations omitted).

**31.** "Every vessel employed in any manner in connection with a violation of this chapter ... shall be subject to forfeiture and all fish taken or retained in violation of this chapter or the monetary value thereof shall be forfeited." 16 U.S.C. § 1082(b), 78 Stat. 194 (repealed 1976).

**32.** 16 U.S.C. § 1082(c), 78 Stat. 194 (repealed 1976).

**33.** *See* 16 U.S.C. § 1860(a) and (b).

**34.** We agree with the noted commentator who said, in discussing the forfeiture provisions, that
> In several important respects, the FCMA preserves the forfeiture scheme of the Bartlett Act. First, the Act requires the forfeiture of all illegally taken or retained fish. The vessel itself continues to be merely "subject to forfeiture." The discretion thus created, however, is expanded over that available to the district courts under the Bartlett Act, in that the first clause of the second sentence of section 310(a) [1860] permits forfeiture of "[a]ll or part" of an offending vessel. Ways had been found to evade the apparent all-or-nothing forfeiture provision of the Bartlett Act even when the case was litigated, but the new law gives welcome express recognition to the possibility that forfeiture of more than the illegal catch but less than the entire vessel might be warranted.

Fidell, *Enforcement of the Fishery Conservation and Management Act of 1976: The Policeman's Lot,* 52 Wash.L.Rev. 513, 540 (1977).

**35.** The government now concedes, contrary to its position below, that a monetary forfeiture can be imposed. They continue to argue that the amount must equal the value of the vessel.