March 31, 1994 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

No. 93-1740

 EAGLE EYE FISHING CORPORATION, ET AL.,

 Petitioners, Appellants,

 v.

 UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

 Respondents, Appellees.

 

 ERRATA SHEET

 The opinion of this Court issued on March 17, 1994, is
amended as follows:

 On cover sheet, under counsel, please delete the following:
with whom Andrew C. Mergen was on brief.
 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

No. 93-1740

 EAGLE EYE FISHING CORPORATION, ET AL.,

 Petitioners, Appellants,

 v.

 UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

 Respondents, Appellees.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Douglas P. Woodlock, U.S. District Judge]
 

 

 Before

 Selya, Boudin and Stahl, Circuit Judges.
 

 

 Edward F. Bradley, Jr., for appellants.
 
 Joan M. Pepin, Attorney, United States Department of
 
Justice, with whom Myles E. Flint, Deputy Assistant Attorney
 
General, A. John Pappalardo, United States Attorney, Edward J.
 
Shawaker, Charles W. Brooks, Patricia Kraniotis, and Karen Antrim
 
Raine were on brief, for appellees.
 

 

 March 17, 1994

 

 SELYA, Circuit Judge. The marlin's tail, a central
 SELYA, Circuit Judge.
 

image in one of the little masterpieces of modern literature,1

today finds a new habitat: we must pass upon a fine levied by

the National Oceanic and Atmospheric Administration (NOAA) for

possession of such a tail. In the last analysis, however, the

appeal does not turn on matters of either ichthyology or

literature, but on pedestrian principles of procedural default.

We conclude that, on the facts of this case, the raise-or-waive

rule must be applied strictly, and, consequently, we affirm the

district court's dismissal of appellants' petition for judicial

review.

 I

 The Tale of the Tail
 

 On April 28, 1989, in San Juan, Puerto Rico, Mahlon

Pickering, an agent of the National Marine Fisheries Service,

observed the severed tail of a large fish hanging from the

rigging of the F/V EAGLE EYE. The agent boarded the craft,

interrogated a crew member, inspected the caudal appendage, and

launched the investigation that led NOAA to charge the vessel's

owner, petitioner-appellant Eagle Eye Fishing Corporation, and

its captain, petitioner-appellant Bruce Beebe, under the Magnuson

Fishery Conservation and Management Act of 1976, 16 U.S.c. 

1801-1882 (1988), and the regulations promulgated pursuant

 

 1See Ernest Hemingway, The Old Man and the Sea 99 (Chas.
 
Scribner's Sons 1952) (describing the marlin tail as "higher than
a big scythe blade and a very pale lavender above the dark blue
water").

 3

thereto, see 50 C.F.R. 644.7(d), 644.22 (1990).2 The
 

regulations prohibit not only capture, but mere possession, of a

billfish such as a blue marlin shoreward of this nation's

exclusive economic zone (EEZ).3

 Appellants denied the charges. Though able to afford

counsel, they chose to appear pro se at the ensuing

administrative hearing. They did not object when the vessel's

logbook was introduced into evidence. By like token, they did

not controvert expert testimony that, assuming a Caribbean catch,

the tail could only belong to a blue marlin. Instead, appellants

argued that NOAA could not prove with the requisite degree of

probability that the tail found aboard appellants' vessel

belonged to a marlin caught in Caribbean waters. They suggested

that the tail perhaps belonged to a black marlin.4

 The administrative law judge (ALJ) found that the fish

had been snagged in Caribbean waters frequented by the blue (but

 

 2Former section 644.7(d) is now recodified as 50 C.F.R. 
644.7(e) (1993).

 3To be precise, the regulations proscribe possession of such
a billfish "by a vessel with a pelagic longline or drift net
aboard or harvested by gear other than rod and reel," 50 C.F.R. 
644.7(d) (1990), "shoreward of the outer boundary of the EEZ,"
id. 644.22. The regulations delineate the EEZ as that span of
 
the sea from the shoreward boundary of each coastal state to
points 200 nautical miles from the "baseline," or low water line,
along the state's coast. See 50 C.F.R. 620.2; see also Thomas
 
J. Schoenbaum, Admiralty and Maritime Law 2-4, at 26 (1987).
Appellants do not dispute that the F/V EAGLE EYE is a vessel
subject to 50 C.F.R. 644.7(d). Similarly, they do not dispute
that San Juan Harbor lies within this nation's EEZ.

 4The black marlin is an unprotected species indigenous to
the Pacific Ocean and the Indian Ocean.

 4

not the black) marlin. He rested that determination on several

pieces of evidence, including, inter alia, (1) the logbook, which
 

verified the vessel's coordinates at all relevant times; (2) a

swordfishing permit, which generally defined the vessel's fishing

area; (3) testimony of a crew member regarding the vessel's

location during the voyage; and (4) Agent Pickering's opinion

that the fish seemed to have been caught only a day or two before

the ship had docked, or, stated differently, four to five days

before he first observed it. Based principally on this

determination as to the situs of the catch, the ALJ decided that

the tail belonged to a blue marlin and fined appellants $5,250.

 Appellants secured counsel and filed a petition seeking

further administrative review, see 15 C.F.R. 904.273. In the
 

course of that review, appellants for the first time argued that

NOAA violated its own confidentiality regulations by publicly

disclosing information contained in the logbook.5 The NOAA

Administrator equivocated about the merits of this argument, but

concluded that, in all events, appellants were barred from

advancing it because they had not raised it before the ALJ.6

 

 5Logbooks of this type must be kept as a matter of course by
all regulated fishing vessels, and the vessels must record
certain specified information therein. See 50 C.F.R. 603. The
 
information is gathered for use in the agency's fisheries
management program and is to be held in confidence, see id.,
 
subject to certain specified exceptions, see, e.g., 50 C.F.R. 
 
603.5, 603.7.

 6The Administrator based his finding of waiver on a
procedural regulation providing that:

 Issues of fact or law not argued before the
 [ALJ] may not be raised on review unless they

 5

 Appellants then sought judicial review pursuant to 16

U.S.C. 1861(d). In their complaint, they again challenged the

use of the logbook at the administrative hearing. The district

court dealt appellants a double blow; the court upheld the agency

determination on the ground of procedural default, and also

concluded that, wholly apart from the logbook, there existed

ample evidence to underbrace the ALJ's finding that appellants

unlawfully possessed a blue marlin within the EEZ. This appeal

followed.

 II

 Troubled Waters
 

 The doctrine of administrative waiver is a subset of

the broader doctrine of procedural default. It teaches that,

"[i]n the usual administrative law case, a court ought not to

consider points which were not seasonably raised before the

agency." Massachusetts Dep't of Pub. Welfare v. Secretary of
 

Agric., 984 F.2d 514, 523 (1st Cir.), cert. denied, 114 S. Ct. 81
 

(1993). This doctrine serves a variety of worthwhile ends,

including judicial economy, agency autonomy, and accuracy of

result.7

 

 were raised for the first time in the initial
 decision, or could not reasonably have been
 foreseen and raised by the parties during the
 hearing.

15 C.F.R. 904.273(d).

 7These interests are similar, but not identical, to the main
interests underlying the concept of administrative exhaustion.
See, e.g., Ezratty v. Puerto Rico, 648 F.2d 770, 774 (1st Cir.
 
1981); United States v. Newmann, 478 F.2d 829, 831 (8th Cir.
 

 6

 To be sure, the general rule of administrative waiver

is ringed with exceptions. See Massachusetts DPW, 984 F.2d at
 

524. Appellants seek to invoke one such exception, applicable to

significant questions of law, especially those of constitutional

magnitude which are not only likely to arise again but also are

susceptible to resolution on the existing record. See, e.g.,
 

United States v. La Guardia, 902 F.2d 1010, 1013 (1st Cir. 1990)
 

(developing this exception in the context of an analogous rule

involving an appellate court's treatment of questions not raised

in the trial court). In furtherance of this attempt, appellants

assert that their confidentiality argument is substantive and

bears on NOAA's central mission of fisheries management, raising

the specter that the agency's misuse of routinely collected

information could drive fishermen to falsify their records. We

are unpersuaded. If the NOAA Administrator shared appellants'

fear, then he could have reached out to decide the

confidentiality issue on administrative review as a matter of

discretion. The fact that he did not do so speaks volumes. We

add, moreover, that appellants come nowhere near satisfying the

other requirements of the La Guardia exception. For example,
 

there is no reason to think that this question will recur after

all, it apparently has not arisen on any other occasion in the

seventeen-year history of the Magnuson Act and, at any rate,

 

1973); see also Massachusetts DPW, 984 F.2d at 523 n.8. This is
 
as it should be, for both rules are aimed at assuring full
development of fact and law at the agency level.

 7

the question cannotconfidently be resolvedon the existingrecord.8

 Appellants have a second hook on their line. They tell

us that they proceeded pro se before the ALJ, represented only by

a corporate officer and the officer could not have been

expected to understand the significance of admitting the logbook

into evidence. Appellants view this circumstance as sufficient

to justify an exception to the administrative waiver rule, either

because, in general, the absence of counsel should insulate

parties from the usual strictures of the rule, or because, in

particular, appellants should be found to come within the

regulatory exception that permits a new argument to be raised if

it "could not reasonably have been foreseen" at the time of the

initial hearing, 15 C.F.R. 904.273(d), quoted supra note 6. We
 

find neither of these theorems to be convincing.

 A pro se litigant, like any litigant, is guaranteed a

meaningful opportunity to be heard. See Logan v. Zimmerman Brush
 

 

 8The government denies that its use of the logbook
transgressed the confidentiality regulation. To the contrary, it
asserts that all individuals who had access to the statistics
fell within the confidentiality exemptions permitting disclosure
to federal employees responsible for monitoring and enforcement
of fisheries management plans, as well as to other NOAA personnel
on a need-to-know basis. See 50 C.F.R. 603.5. The government
 
also argues that limited use of otherwise confidential data, such
as logbook information, is frequently allowed for purposes of
enforcement proceedings in federal courts, see, e.g., United
 
States v. Kaiyo Maru No. 53, 699 F.2d 989, 992 (9th Cir. 1983);
 
United States v. Daiei Maru No. 2, 562 F. Supp. 34, 35 (D. Alaska
 
1982), as well as in administrative proceedings, see, e.g., In re
 
Ostrovsry, 5 Ocean Resources and Wildlife Reporter (ORW) 578
 
(NOAA 1987); In re Shoffler, 3 ORW 618 (NOAA 1984). The
 
administrative record is not sufficiently well developed to
enable enlightened resolution of these contentions a
circumstance which, in itself, militates strongly against
excusing appellants' administrative waiver.

 8

Co., 455 U.S. 422, 437 (1982). While courts have historically
 

loosened the reins for pro se parties, see, e.g., Haines v.
 

Kerner, 404 U.S. 519, 520-21 (1972) (suggesting that courts
 

should construe a pro se litigant's pleadings with liberality),

the "right of self-representation is not `a license not to comply

with relevant rules of procedural and substantive law.'" Andrews
 

v. Bechtel Power Corp., 780 F.2d 124, 140 (1st Cir. 1985)
 

(quoting Faretta v. California, 422 U.S. 806, 835 n.46 (1975)),
 

cert. denied, 476 U.S. 1172 (1986). The Constitution does not
 

require judges or agencies, for that matter to take up the

slack when a party elects to represent himself. See McKaskle v.
 

Wiggins, 465 U.S. 168, 183-84 (1984) (explaining that courts need
 

not "take over chores for a pro se defendant that would normally

be attended to by trained counsel as a matter of course").

 Although Faretta and McKaskle are criminal cases, the
 

principles for which they stand are fully applicable in this

instance. Indeed, there is a long line of authority rejecting

the notion that pro se litigants in either civil or regulatory

cases are entitled to extra procedural swaddling. See Julie M.
 

Bradlow, Comment, Procedural Due Process Rights of Pro Se Civil
 

Litigants, 55 U. Chi. L. Rev. 659, 668 nn.41,42 (1988)
 

(collecting cases); see also Andrews, 780 F.2d at 140 (declining
 

to carve out a pro se exception to Fed. R. Evid. 103(a)(2)).

While we can imagine cases in which a court appropriately might

extend special solicitude to a pro se litigant, see, e.g., Rana
 

v. United States, 812 F.2d 887, 889 n.2 (4th Cir. 1987) (dictum),
 

 9

the instant case is clearly not cut from that cloth. Appellants

simply appear to have been penny wise and pound foolish; they

knowingly chose to handle their own defense, forsaking

professional assistance; they lost; and no miscarriage of justice

looms. Consequently, appellants must reap the predictable

harvest of their procedural default.

 We give short shrift to appellants' claim that, due to

their pro se status, the confidentiality argument "could not

reasonably have been foreseen and raised," 15 C.F.R. 

904.273(d), during the initial round of hearings. The exception

limned in this regulation is a narrow one. It should be applied

sparingly. And, moreover, foreseeability in this context must be

judged according to a standard of objective reasonableness. Cf.
 

Jorgensen v. Massachusetts Port Auth., 905 F.2d 515, 521 (1st
 

Cir. 1990) (explaining, in the tort context, that foreseeability

should be judged by means of a similar standard). Hence, parties

who choose to represent themselves must be held to anticipate

what trained counsel would ordinarily anticipate. In other

words, if a reasonably well-prepared litigant could have foreseen

an issue, and would have raised it, then the exception contained

in the regulation does not pertain. So it is here.

 III

 An Anchor to Windward
 

 Before ending our voyage, we add that any error was

harmless. We have carefully reviewed the record and are

confident that suppression of the logbook would have had no

 10

effect on the outcome of the proceeding. Although the logbook

entries comprise the only evidence establishing the precise
 

location of the F/V EAGLE EYE, the record makes manifest that the

agency's case depends upon the general location of the vessel,
 

not its exact longitude and latitude at any given moment. Here,

substantial evidence apart from the logbook entries establishes

beyond serious hope of contradiction that the vessel was in the

Caribbean at the time it caught the fish to which the offending

tail was once attached. That evidence, without more, was fully

sufficient to confirm the species of fish and, consequently, to

warrant a finding that the regulations had been infringed.

 IV

 The Tail of the Tale of the Tail
 

 We need go no further. In many respects, these

proceedings parallel Hemingway's novella. Before the ALJ,

appellants "tried not to think but only to endure." Hemingway,

supra, at 50. On administrative review, they acted as if "[e]ach
 

time was a new time." Id. at 73. But these apothegms make
 

better sense on the open sea than they do in open court. Here,

at long last, appellants must recognize that, in Hemingway's

words, they are "beaten now finally and without remedy." Id. at
 

131. The civil penalty assessed by NOAA must be paid.

Affirmed.
 

 11