787 F.2d 857
 16 Envtl. L. Rep. 20,526
 Gosta (Swede) LOVGREN
v.
John V. BYRNE, Administrator, United States Department of
Commerce, National Oceanic and Atmospheric
Administration, Washington, D.C. and the
National Marine Fisheries Service,
United States of America, Defendant Intervenor.
Appeal of Gosta (Swede) LOVGREN and Lovgren Enterprises.
 No. 85-5180.
 United States Court of Appeals,
Third Circuit.
 Jan. 10, 1986.
Decided March 26, 1986.
 
 Marlene Lynch Ford, Ford & Berkowitz, Point Peasant Beach, N.J., for appellant.
 F. Henry Habicht II, Asst. Atty. Gen., Roger J. Marzulla, Deputy Asst. Atty. Gen., Thomas W. Greelish, U.S. Atty., Newark, N.J., Irene Dowdy, Asst. U.S. Atty., Trenton, N.J., Jacques B. Gelin, Leslie Kannan, Blake A. Watson, Attys., Dept. of Justice, Linda I. Marks, Charles R. Juliand, Attys., Dept. of Commerce, NOAA, Washington, D.C., for appellees.
 Before GARTH and STAPLETON, Circuit Judges, and FULLAM, District Judge.*
 OPINION OF THE COURT
 STAPLETON, Circuit Judge.
 
 
 1
 Gosta Lovgren and Lovgren Enterprises ("Lovgren") were found by an administrative law judge to have violated two regulations issued pursuant to the Magnuson Fishery Conservation and Management Act, 16 U.S.C. Sec. 1801 et seq. ("The Magnuson Act") and fined $50,000. The district court denied relief and Lovgren appealed to this court. We affirm.
 
 I.
 
 2
 On March 24, 1983, while the LYDIA J, a fishing boat, was unloading its catch at a dock owned by Lovgren Enterprises, agents of the National Marine Fisheries Service arrived at Lovgren's dock for the purpose of inspecting the fish being unloaded. This was a routine inspection and the officials did not suspect violation of any federal or state law.
 
 
 3
 The officials identified themselves upon Mr. Lovgren's request. Because his view of the fish already brought ashore was obstructed, Agent Livingston requested permission to climb onto a platform approximately five feet above the dock, upon which Lovgren was already standing. The other officer remained on the dock. The following is Agent Livingston's uncontradicted testimony:
 
 
 4
 As I proceeded up the ladder, in order to get a better look as to what was coming up the conveyor belt, Mr. Lovgren came to the top rung of the ladder and stood there so I couldn't complete my climb. It was at this time I said to him, you know, I wish to inspect the catch coming off the boat.... He said to me you f****** guys s***. You're nothing but a pain in the a**. I don't recognize National Marine Fishery Service's authority to be on my premises, pointing to me, and then he said to Mr. Winkle, he said I have no b**** with the New Jersey, but the National Marine Fishery Service has f***** up this industry and I want you off my property, pointing back to me.
 
 
 5
 I then asked him, are you prohibiting me from inspecting this boat and its catch on these premises? He said yes, I am. I said thank you very much, have a good night.
 
 
 6
 Agent Livingston testified that he had felt physically threatened during this encounter. "I was suspended on that ladder in a physically vulnerable position. If I had in my mind proceeded to the top rung and gone that step further there would have been a physical confrontation."
 
 
 7
 Lovgren was subsequently charged with violating two regulations issued pursuant to the Magnuson Act. An administrative law judge found Lovgren liable on both counts and, despite the fact that the government had requested a total penalty of $5,000, the ALJ ordered a $50,000 fine for the two violations. However, the ALJ suspended all but $10,000 of the fine on the conditions that (1) Lovgren cooperate with the government during the pendency of any appeal, and (2) commit no other violation of the Act for three years.
 
 
 8
 Lovgren's petition to the Administrator of the National Oceanic and Atmospheric Administration was denied. Subsequently, he filed this suit in district court to review the civil penalties. The district court upheld the assessment of the civil penalties and this appeal followed. Lovgren argues that the findings that he had violated the Magnuson Act regulations are not supported by the evidence. He also argues that the doctrine of merger bars his conviction on both counts. Third, he contends that the regulations he was found to have violated are invalid because they are not authorized by the Magnuson Act. Fourth, he contends that he was impermissibly punished for exercising his first amendment rights. Finally, Lovgren argues that the fines assessed by the ALJ are excessive.
 
 II.
 A. The Magnuson Act
 
 9
 The Congress's intent in passing the Magnuson Act was to protect our nation's coastal fish, the national fishing industry, and dependent coastal economies from the stresses caused by overfishing in the waters adjacent to territorial waters. 16 U.S.C. Sec. 1801(a)(1).
 
 
 10
 The Magnuson Act was enacted at a time when overfishing of coastal waters was commonplace, threatening the existence of a number of species of fish. Congress found this threat aggravated by the inability effectively to regulate fishing beyond the three mile jurisdictional limit. See Magnuson, The Fishery Conservation and Management Act of 1976: First Step Toward Improved Management of Marine Fisheries, 52 Wash.L.Rev., 427, 431-33 (1977); see also S.Rep. No. 94-416, 94th Cong., 1st Sess. (1975) reprinted in A Legislative History of The Fishery Conservation and Management Act, Senate Comm. on Commerce, 94th Cong., 2d Sess., 666 (Comm.Print 1976) (hereinafter cited as "Legislative History--S.Rep.")
 
 
 11
 Congress found that a viable management scheme for the Nation's fishery resources was a necessary concomitant of an extended fishery zone. Title II of the Act established seven Regional Fishery Management Councils (one for each major ocean area) to institute programs for the management and conservation of fishery resources in a "Fishery Conservation Zone" extending 200 nautical miles from the seaward boundary of each of the coastal states. This action was deemed necessary to "assure that a supply of food and other fish products is available on a continuing basis and so that irreversible or long-term adverse effects on fishery resources or on the marine ecosystem are rendered highly unlikely." Legislative History--S.Rep. at 657. Congress found it "absolutely vital that a national management program, properly tailored to take account of the variability of fish resources, the individuality of the fishermen, the needs of the consumer, and the obligations to the general public, be established." Id. at 684.
 
 
 12
 In order to implement this new institutional mechanism, Congress developed national standards for fishery management and conservation. The second standard, described as "one of the most important standards," Id at 685, states that management and conservation measures are to be based upon the best scientific information available. See 16 U.S.C. Secs. 1801(c)(3), 1851(a)(2). This emphasis demonstrated Congress's recognition that proper information was essential to the success of its management scheme. Obtaining accurate information concerning the fish caught in the regional zones is, therefore, central to the purposes of the Act.
 
 
 13
 To accomplish this goal, Congress provided, inter alia, that authorized enforcement officers may, "with or without a warrant or other process ... board, and search or inspect, any fishing vessel" and "seize any fish (wherever found) taken or retained in violation of any provision of this chapter...." 16 U.S.C. Secs. 1861(b)(1)(A)(ii) & (iv). Additionally, enforcement officers are authorized to "exercise any other lawful authority." 16 U.S.C. Sec. 1861(b)(1)(C).
 
 
 14
 It is unlawful to violate any provision of the Act or any regulation issued pursuant to the Act. 16 U.S.C. Sec. 1857(1)(A). The Act provides for a maximum civil penalty of $25,000 for each violation. 16 U.S.C. Sec. 1858(a). The amount of the penalty is assessed by the Secretary by reference to the "nature, circumstances, extent, and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, [and] ability to pay...." Id.
 
 B. Sufficiency of the Evidence
 
 15
 Lovgren's first argument is that, because the ALJ's findings are not supported by substantial evidence, the fines cannot stand. We agree with Lovgren as to the appropriate standard of review of the ALJ's findings, see 16 U.S.C. Sec. 1858(b); Laird v. Interstate Commerce Commission, 691 F.2d 147, 150 (3d Cir.1982), cert. denied 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983), but find unassailable the district court's conclusion that the ALJ's decision was justified by substantial evidence.
 
 
 16
 The ALJ concluded that Lovgren had "purposefully and effectively foreclosed the agents from carrying out their investigatory duty" by refusing them access to the platform. This action violates 50 C.F.R. Sec. 651.7(1), which makes it unlawful to refuse to permit an authorized officer to enter an "area of custody" for purposes of conducting an inspection.[1]
 
 
 17
 Lovgren concedes that he refused the special agents access to the platform onto which the fish from the LYDIA J were being unloaded. Furthermore, he does not dispute that the platform was an "area of custody" under the regulations. His argument seems to be that standing on the top of a ladder is not sufficient to violate the Act. However, he is being punished not for the station he maintained, but for the passage he denied.
 
 
 18
 Lovgren also challenges the ALJ's finding of liability on the second count, based on 50 C.F.R. Sec. 651.7(m), because no actual physical confrontation occurred.[2] However, Lovgren admits that he "was upset" and that he "tends to be a volatile person." Moreover, he agreed that his statements to the agents were "aggressive" and that it was "possible" that his intent was to prevent Agent Livingston physically from coming up the ladder.
 
 
 19
 Both agents testified that Lovgren's act and manner of standing at the top of the platform with Livingston on the ladder below him were "threatening" and Livingston testified that he believed himself to be in a physically threatening position.
 
 
 20
 This testimony supports the ALJ's conclusion that Lovgren's resistance to the inspection contained elements of force and implied threats of violence. The regulation does not require fisticuffs. Forceful resistance, intimidation or interference suffices.
 
 
 21
 We therefore agree with the district court that substantial evidence supports the conclusion that Lovgren's lack of cooperation contained elements of forceful resistance. This is sufficient to support the finding of a violation of 50 C.F.R. Sec. 651.7(m).
 
 C. Merger
 
 22
 Appellant's appeal to the common law of merger is also unpersuasive. That doctrine, now largely repudiated, was that "when the commission of a crime involved the doing of one or more criminal acts, some of which were misdemeanors, ... the misdemeanors merged in the felony and could not be separately prosecuted as individual crimes." 1 WHARTON, CRIMINAL LAW & PROCEDURE (Anderson Ed., 1957) Sec. 33. This doctrine simply does not apply to Lovgren's case.
 
 
 23
 While couched in terms of merger, Lovgren's argument appears at times to invoke elements of double jeopardy jurisprudence. Even if we assume that double jeopardy interests are implicated by the civil fines of the Magnuson Act[3], however, we find no conflict between the double jeopardy clause and the two fines imposed by the ALJ.
 
 
 24
 "With respect to cumulative sentences imposed in a single ... [prosecution], the double jeopardy clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). Accordingly, the issue which this aspect of Lovgren's argument poses is whether Sections 651.7(1) and 651.7(m) were intended to proscribe two offenses for which two fines could be imposed. The rule of construction which the courts have utilized in answering this kind of question was announced in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). "The appropriate inquiry under Blockburger is 'whether each provision requires proof of a fact which the other does not.' " (citation omitted). Ball v. United States, --- U.S. ----, 105 S.Ct. 1668, 1672, 84 L.Ed.2d 740 (1985).[4] If so, it is appropriate to conclude that the possibility of cumulative punishment was intended. If not and if no other evidence of an intention to create separate offenses is found, it will be presumed that cumulative punishment was not intended. Hunter, 459 U.S. at 366, 103 S.Ct. at 678.
 
 
 25
 As we have earlier noted, Section 651.7(m) requires a showing of the use of force or the threat thereof; Section 651.7(l) requires no such showing. Conversely, Section 651.7(l) requires a showing that an enforcement agent was denied access to an area in which he or she sought to conduct an inspection. While a violation of Section 651.7(m) might involve such a denial, such proof is not a prerequisite to a violation of that section. Thus, for example, one may violate Section 651.7(m) by forcefully interfering with an inspection after the agent has secured admission to the area to be inspected.
 
 
 26
 Because Sections 651.7(l) and 651.7(m) each require proof of a fact which the other does not, they constitute separate offenses for which cumulative punishment is permissible.
 
 D. The Validity of the Regulations
 
 27
 The Magnuson Act explicitly authorizes inspections of fishing vessels either with or without a warrant. 16 U.S.C. Sec. 1861(b)(1)(A)(ii). See United States v. Kaiyo Maru No. 53, 699 F.2d 989 (9th Cir.1983); United States v. Tsuda Maru, 470 F.Supp. 1223 (D.Alaska 1979). The regulations extend that authority beyond the vessels themselves to "areas of custody," defined as "any vessels, building, vehicles, piers, or dock facilities where groundfish may be found." 50 C.F.R. Sec. 651.2. Lovgren claims that the Act, when properly read in the context of the strictures of the fourth amendment, does not authorize this extension of the inspector's purview and that the regulations he was found to have violated are accordingly invalid. We conclude that Lovgren's reading of the Act is unduly restrictive and that no fourth amendment problems are created by according the Act its intended scope.
 
 
 28
 1. Scope of Inspections Under the Magnuson Act
 
 
 29
 As we have earlier noted, the Act directs the Secretary of Commerce, with the assistance of Regional Fishery Management Councils, to develop regional fishery management plans and to promulgate regulations to implement those plans. 16 U.S.C. Secs. 1853 and 1854. A plan may "prescribe" all "measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. Sec. 1853(b)(8). Moreover, the Secretary is directed to "promulgate each regulation that is necessary to carry out a plan." 16 U.S.C. Sec. 1855(c).
 
 
 30
 Pursuant to this broad authority, Part 651 of the regulations implements the Interim Fishery Management Plan for Atlantic Groundfish (i.e., Cod, Haddock, and Yellowtail Flounder). Included in that Part are the prohibitions against denying access to areas of custody and forcibly interfering with the inspection in such areas. It seems to us that the Secretary was well within his authority in determining that inspection of dock areas where groundfish are unshipped was necessary in order to monitor compliance with the requirements of the plan and obtain necessary management data.
 
 
 31
 If inspecting officials were able only to observe fish remaining on board a vessel, the agency's efforts to gather accurate information would be substantially frustrated. Those wishing to evade inspection would be aware that once the fish have reached the dock, they are safe from inspection unless the official has previously obtained a search warrant, a difficult task where the fishermen keep to no prearranged schedule. Furthermore, access by land to the fishing vessel itself would become much more difficult were officials required to obtain a warrant before being able to cross over docks to reach the vessel. This interpretation would thus significantly hamper those officials charged with the protection of our scarce fishing resources.
 
 
 32
 Lovgren does not dispute that inspection of his dock would facilitate implementation of the Atlantic Groundfish Plan. His argument is rather that the Act, by expressly mentioning only the warrantless search of vessels[5], impliedly denied dock inspections to the Secretary and that such an intention should be attributed to Congress because a contrary one would create serious fourth amendment problems. We disagree.
 
 
 33
 The negative implication which Lovgren would have us draw is not a necessary one. Given the broad regulatory authority conferred upon the Secretary it seems to us unlikely. Moreover, we believe the legislative history of the Act counsels against accepting Lovgren's argument. The Senate bill provided only for seizure of fish found on fishing vessels. S. 961, 94th Cong., 1st Sess., Sec. 10(b)(4) [Sec. 311(b)(4) ].[6] Both the House bill, H.R. 200, 94th Cong., 1st Sess. Sec. 314(b)(5), [Sec. 311(b)(5) ], and the bill as enacted authorized officials to seize fish wherever found.[7] The change from the Senate bill's language to that of the bill as enacted suggests that Congress consciously extended the authority to seize fish without a warrant beyond the confines of a vessel and, a fortiori, that Congress anticipated that agents might look for those fish without a warrant wherever they could be seized.
 
 
 34
 2. Scope of Inspections Under the Fourth Amendment
 
 
 35
 The fourth amendment protects individuals from unreasonable searches and seizures and imposes an obligation on the government to respect the reasonable privacy and security interests of individuals. See Marshall v. Barlows, Inc., 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978). A government search of private property conducted without proper consent is infirm unless it has been authorized by a valid search warrant or comes within one of a few carefully defined exceptions to the general rule. See Camara v. Municipal Court, 387 U.S. 523, 528-29, 87 S.Ct. 1727, 1730-31, 18 L.Ed.2d 930 (1967). Whether a warrantless search is nevertheless a reasonable one depends on the reasonableness of the expectation of privacy in the area searched, the importance of the governmental interest occasioning the search, and the degree to which alleged authority for the search is tailored to that interest and minimizes the intrusion. Donovan v. Dewey, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). We conclude that Lovgren had little if any reasonable expectation of privacy in his dock during the unshipping of a fishing vessel, that the governmental interest which occasioned the search is a compelling one and that the Magnuson Act and regulations do not invite unnecessary intrusion on privacy. Accordingly, we find that the Secretary's construction of his authority raises no fourth amendment problem.
 
 
 36
 "[T]he expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home." Dewey, 452 U.S. at 598-99, 101 S.Ct. at 2537-38 (citations omitted); see Bionic Auto Parts and Sales, Inc. v. Fahner, 721 F.2d 1072, 1078 (7th Cir.1983). Moreover, one who is engaged in an industry that is pervasively regulated by the government or that has been historically subject to such close supervision is ordinarily held to be on notice that periodic inspections will occur and, accordingly, has no reasonable expectations of privacy in the areas where he knows those inspections will occur. Donovan v. Dewey, 452 U.S. 594, 606, 101 S.Ct. 2534, 2542, 69 L.Ed.2d 262 (1981); United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); Colonnade Catering Corporation v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).
 
 
 37
 The industry of which Lovgren is a part is pervasively regulated. The management plans created pursuant to the Act regulate the type, number, size, and timing of the catch that can lawfully be taken as well as the equipment that may be used in its taking. Vessels must be licensed and must account for their activities. While Lovgren himself is not the operator of a vessel, he services licensed vessels from a location where surveillance is necessary to the enforcement of the overall management scheme.
 
 
 38
 In addition, while the Magnuson Act is of relatively recent origin, the fishing industry has been the subject of pervasive governmental regulation almost since the founding of the Republic.[8] Indeed the expectation of finding the game warden looking over one's shoulder at the catch is virtually as old as fishing itself.
 
 
 39
 Also relevant to Lovgren's expectation of privacy is the fact that his dock is located on the territorial boundary of our nation and services vessels which are returning from voyages beyond its territorial waters. Given the long history of governmental control of such border activity, see e.g., 19 U.S.C., Sec. 482; United States v. Cascante-Bernitta, 711 F.2d 36 (5th Cir.), cert. denied 464 U.S. 898, 104 S.Ct. 252, 78 L.Ed.2d 239 (1983); United States v. Weil, 432 F.2d 1320 (9th Cir.1970), cert. denied 401 U.S. 947, 91 S.Ct. 933, 28 L.Ed.2d 230 (1971), as well as the government regulation of the fishing industry, one can conclude with confidence that Lovgren, when he decided to engage in his business, must have been aware that government intrusions were bound to occur in the regular course of that business.
 
 
 40
 That the federal interests at stake in the effective enforcement of the Fisheries Management programs are vital to the country has been clearly articulated by Congress.[9] We agree that there is a strong federal interest in protecting the natural resources within the Fishery Conservation Zone. "Congress was aware that an important national asset was at stake and that strong measures were necessary." Kaiyo Maru No. 53, 699 F.2d at 995; see Legislative History-S.Rep. at 666-71. The measures taken, including the allowance for warrantless inspections of dock areas for the purpose of identifying the fish being off-loaded, appear reasonable in light of this strong federal interest.
 
 
 41
 Although fishing operations in the Fishery Conservation Zone are frequently observed by aircraft and other vessels, the quantity of fish caught can only be accurately determined as the catch is unshipped after the vessel docks. As this record indicates, these landing areas are at times extremely active, particularly when the fishing vessels are discharging their catch. After the fish are transferred to shore, the various species of fish are frequently commingled with the catch from other vessels and usually are soon dispatched to market, canneries or other processors. Although the principal activity subject to regulatory control under the Magnuson Act is the fishery operation itself, the accurate determination of the quantities, and to a significant extent the species, of fish caught depends principally upon the weighing and tallying of the vessel's catch after the vessel has docked.
 
 
 42
 Unlike See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), a case involving housing code violations, and Marshall v. Barlow's Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), a case involving OSHA inspections, the government in this case will rarely have time to obtain a warrant before the status quo is changed. The fish are highly perishable and even in the best of circumstance are unlikely to remain on the docks for any length of time. Moreover, it would often be difficult to obtain a warrant in advance since the purpose of inspection will frequently be limited to obtaining information, not seeking out wrongdoers. The government often will not know when and where fishing boats will dock after returning from the Fishery Conservation Zone. See Kaiyo Maru No. 53, 699 F.2d at 995-96.
 
 
 43
 Finally, the statute sufficiently limits the inspecting officers in the field as to render warrantless inspections reasonable within the meaning of the fourth amendment. Enforcement is limited to those officers authorized by the Secretaries of Commerce and Transportation. 16 U.S.C. Sec. 1861(b). Furthermore, the inspection scheme is carefully tailored to the requirements of the Act and does not unnecessarily intrude on the reasonable privacy interests of those in the industry. The scope of the inspection is limited to only those times when and those places where groundfish may be found. 50 CFR Sec. 651.2. Individuals can only be fined for refusing to permit a search "in connection with the enforcement of the Magnuson Act." 50 CFR Sec. 651.7(1). Thus, the participants in the fishing industry need not fear an attempt by the government to use the warrantless search provisions of the Act to enforce other statutes or to discover other criminal activity. See United States v. Warren, 578 F.2d 1058 (5th Cir.1978).
 
 E. Other Claims
 
 44
 Lovgren's remaining claims do not require extended discussion. Contrary to his assertions, Lovgren was punished for denying access to the agents and for forcibly interfering with the agents' inspection; he was not punished for exercising his rights of free speech. The first amendment does not insulate Lovgren's refusal to obey the law, even if motivated by a political belief. See, e.g., Kahn v. United States, 753 F.2d 1208, 1214-17 (3d Cir.1985). Finally, we cannot say that the ALJ abused his discretion by imposing a greater penalty on Lovgren than the government had sought. The ALJ explicitly took into account each factor required by the statute, 18 U.S.C. Sec. 1858(a), and explained why he felt justified in assessing the maximum penalty allowed. We cannot say that this penalty was unwarranted in law or without justification in fact, and therefore see no reason to overturn the ALJ's determination. See Butz v. Glover Livestock Commission, 411 U.S. 182, 185, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973).
 
 III.
 
 45
 For these reasons, the judgment of the district court will be affirmed.
 
 
 46
 FULLAM, District Judge, dissenting in part.
 
 
 47
 I agree entirely with the excellent majority opinion, except for its conclusion that there is adequate evidentiary support for imposing separate penalties for two separate violations. It is quite clear that appellant violated 50 C.F.R. 651.7(1), in that he did "refuse to permit an authorized officer to board a fishing vessel, or to enter areas of custody, subject to such person's control, for purposes of conducting any search or inspection in connection with the enforcement of the Magnuson Act...." But there is no evidence to support the separate charge of violation of 50 C.F.R. 651.7(m). Under the undisputed facts, appellant simply did not "forcibly assault, resist, oppose, impede, intimidate, or interfere with any authorized officer in the conduct of any inspection or search...." [Emphasis supplied.]
 
 
 48
 Appellant was not liable to punishment for expressing negative views of the federal program and its officials. The words used, however colorful, cannot be regarded as amounting to assault or intimidation; there is simply no evidence that appellant "forcibly" did anything. He just made clear to the inspector that he would not permit the inspector on the dock. This was an obvious violation of 651.7(1), but it was--also obviously, I suggest,--not a violation of 651.7(m).
 
 
 49
 There was no use or actual threat of force. The officer's perception that appellant was angry, and the concomitant (alleged) apprehension that, if the officer had insisted on proceeding with the search, force might have been used against him, simply do not suffice to establish a violation of 651.7(m). Moreover, the officer was not then "in the conduct of" a search or inspection--he had been denied permission to begin one. To the extent that the majority sustains the separate penalty under 651.7(m), therefore, I respectfully dissent.
 
 
 
 *
 Honorable John P. Fullam, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 50 C.F.R. 651.7(1): It is unlawful for any person to:
 Refuse to permit an Authorized Officer to board a fishing vessel, or to enter areas of custody, subject to such person's control, for purposes of conducting any search or inspection in connection with the enforcement of the Magnuson Act, this part, or any other regulation promulgated under the Magnuson Act.
 "Areas of Custody" is defined in the regulations to include "any vessels, buildings, vehicles, piers or dock facilities where groundfish may be found." 50 C.F.R. Sec. 651.2.
 
 
 [2]
 50 C.F.R. 651.7(m): It is unlawful for any person to
 Forcibly assault, resist, oppose, impede, intimidate, or interfere with any Authorized Officer in the conduct of any inspection or search described in paragraph (1) of this section.
 
 
 [3]
 See Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938). (Double jeopardy clause not applicable to civil fines.)
 
 
 [4]
 Where the provisions at issue are not statutes, but regulations, we see no reason for a different analysis. See F.A.A. v. Landy, 705 F.2d 624, 637 (2d Cir.1983)
 
 
 [5]
 Section 1861(b)(1) provides:
 (1) Any officer who is authorized (by the Secretary, the Secretary of the department in which the Coast Guard is operating, or the head of any Federal or State agency which has entered into an agreement with such Secretaries under subsection (a) of this section) to enforce the provisions of this chapter may--
 (A) with or without a warrant or other process--
 (i) arrest any person, if he has reasonable cause to believe that such person has committed an act prohibited by section 1857 of this title;
 (ii) board, and search or inspect, any fishing vessel which is subject to the provisions of this chapter;
 (iii) seize any fishing vessel (together with its fishing gear, furniture, appurtenances, stores, and cargo) used or employed in, or with respect to which it reasonably appears that such vessel was used or employed in, the violation of any provision of this chapter;
 (iv) seize any fish (wherever found) taken or retained in violation of any provision of this chapter;
 (v) seize any other evidence related to any violation of any provision of this chapter;
 (B) execute any warrant or other process issued by any court of competent jurisdiction; and
 (C) exercise any other lawful authority.
 
 
 [6]
 "Any person, duly authorized, ... may ... seize all fish and fishing gear found aboard any fishing vessel or fishing support vessel which is engaged in any act prohibited by Section 9(a) of this Act."
 
 
 [7]
 The House bill reads: "Any individual authorized ... to enforce the provisions of this Act, any regulation issued thereunder ... may ... with or without a warrant or other process, board and inspect any fishing vessel ... and its catch; ... [and] seize any fish, wherever found, taken in violation of any provision of this Act...."
 
 
 [8]
 Lovgren concedes this point. Appellant's Brief at 18-19. The fishing industry has been regulated since at least 1793 when licenses were required for vessels engaged in cod and mackeral fishing. See Act of Feb. 18, 1793, 1 Stat. 305. See also 46 U.S.C. Sec. 263; The Nymph, 18 F.Case 506 (No. 10,388) (C.C.Me.1834); U.S. v. The Reindeer, 27 F.Case 758 (No. 16,145) (C.C.R.I.1848(?)); U.S. v. The Paryntha Davis, 27 (?) F.Case 454 (No. 16003) (C.C.Me.1860). Kaiyo Maru, 699 F.2d at 994-97, United States v. Raub, 637 F.2d 1205, 1209 (9th Cir.1980), and Tsuda Maru, 470 F.Supp. at 1228-30, have agreed that the coastal fishing industry is "closely regulated" because of the pervasive regulation of the fishing industry and important government interests implicated in managing and conserving fishery resources
 
 
 [9]
 Congress set out its findings in the Magnuson Act:
 (1) The fish off the coasts of the United States ... constitute valuable and renewable resources. These fishery resources contribute to the food supply, economy, and health of the Nation and provide recreational opportunities.
 (2) As a consequence of increased fishing pressure and because of the inadequacy of fishery conservation and management practices and controls (A) certain stocks of such fish have been overfished to the point where their survival is threatened ...
 (3) Commercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation. Many coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged by the overfishing of fishery resources at an ever-increasing rate over the past decade....
 (5) Fishery resources are finite but renewable. If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained ...
 (6) A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, and to realize the full potential of the Nation's fishery resources....
 16 U.S.C. Sec. 1801(a)