Roy R. DIEHL, Plaintiff,

v.

Barbara H. FRANKLIN, Secretary of Commerce, Defendant.

Civ. No. 92–4084 (GEB).

United States District Court, D. New Jersey.

July 15, 1993.

---

Ronald E. Reisner, Tucci and Reisner, West Long Branch, NJ, David E. Frolla, Brand & Lowell, Washington, DC (argued), for plaintiff Roy Diehl.

Michael Chertoff, U.S. Atty., D. N.J., Irene Dowdy, Asst. U.S. Atty., Patricia Kraniotis, NOAA Office of Gen. Counsel, Silver Spring, MD (argued), for defendant Secretary of Commerce.

## MEMORANDUM AND ORDER

GARRETT E. BROWN, Jr., District Judge.

This is an action under 16 U.S.C. § 1858(b) for review of a $10,000 civil penalty imposed on plaintiff Roy R. Diehl. The National Oceanic and Atmospheric Administration ("NOAA" or "the agency"), a federal agency within the Department of Commerce responsible for enforcing the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1882 ("the Act"), imposed the penalty on the grounds that plaintiff interfered with a lawful investigation under the Act in violation of 16 U.S.C. § 1857(1)(A) and 50 C.F.R. § 625.7(b)(4). Plaintiff challenges both the finding of liability and the amount of the penalty. Defendant has counter-claimed for payment of the penalty.

Two motions are now before the Court: defendant's motion for summary judgment dismissing the complaint and granting the counterclaim, and plaintiff's cross-motion to dismiss the counterclaim. Having heard oral argument, for the reasons set forth below the Court will grant defendant's motion in part and grant plaintiff's. Further, having reviewed the entire record, the briefs submitted, and the arguments of counsel, the Court concludes that plaintiff may be penalized for interfering with an investigation under the Act, but that the amount of the penalty must be reconsidered in light of the factors Congress set forth in the Act.

## BACKGROUND

Shortly after midnight on May 22, 1989, three members of the United States Coast

Guard ("USCG") stood on the beach outside of the USCG station in Sandy Hook, New Jersey. They noticed a vessel offshore, running without lights and making sweeps back and forth. They contacted a USCG boat by radio and guided it to the vessel's location. The USCG boat arrived and identified the fishing vessel MISS JEAN with two persons aboard, plaintiff Roy Diehl, the owner and master, and his mate, Edward Vance. They ordered plaintiff to proceed to the Sandy Hook USCG station for a routine law enforcement boarding and inspection. Plaintiff complied with the order. *See* Tr. 8/30/90, at 13–21, 64–68, 114–17, 170, 179–81 (Ex. 41).[1]

At the station, USCG Officer Norton ordered plaintiff and Vance off the F/V MISS JEAN and explained that he and two other USCG members, Griffin and Pechacek, were going to board the vessel for a routine inspection. Plaintiff was permitted to return to the vessel and be present during the initial inspection. *Id.* 41–42, 129. Coming aboard, the USCG members noticed a pile of fish on the deck. After the routine inspection,[2] the USCG Sandy Hook headquarters contacted the New Jersey Division of Fish, Game and Wildlife. At approximately 3:30 a.m., Todd Eisenhuth, a state conservation officer with authority to enforce the Act, arrived at the scene. When he arrived, the USCG members told him that plaintiff had been running without lights and that they suspected him of fishing illegally. They asked Eisenhuth to inspect plaintiff's catch for compliance with both state and federal law. *Id.* 143, 147.

Eisenhuth boarded the F/V MISS JEAN, where plaintiff and his mate were waiting. At the time, plaintiff was carrying on in a belligerent manner toward the USCG members, who were standing on the dock a short distance away. *Id.* 144. Eisenhuth testified that plaintiff subjected the USCG members to "a series of foul language" in a "loud tone

of voice." *Id.* 148. Plaintiff's commentary went on throughout the time Eisenhuth was on the vessel. *Id.* 150. USCG member Pechacek testified as to the nature of comments made during the night: "[T]here were comments, snide comments, rude comments towards myself, towards my boarding team members made throughout the night. Rude comments, threats to kick our asses, and then take us to have a beer. The threat I'm going to kill you, the threat that we don't—we don't know what they're—what we're doing. The threat I should walk down the boat and get a shotgun and blow off a couple of rounds and then maybe you'll shit your pants." *Id.* 103.

Plaintiff directed the death threat to USCG member Jeff Norton. Five months earlier, in January 1989, Norton had been involved in a USCG boarding of the F/V MISS JEAN at sea, as a result of which, plaintiff alleges, his vessel was damaged. Although there is some dispute about exactly when during the evening plaintiff made the threat and whether it was provoked in any way,[3] there is no dispute that he made it. Norton testified that plaintiff said, "You mother fucker, I will kill you and you will never get a chance to do another boarding on my vessel. I don't care if I have to go to jail for 15 years, I'm going to kill you." *Id.* 26. Eisenhuth and Pechacek testified that they heard plaintiff make the threat. *Id.* 71, 144–45, 150. In addition, Richard Livingston, an agent with the National Marine Fisheries Service, testified that a week after the incident plaintiff admitted that he had threatened Norton. *Id.* 157, 159. Mark Chicketano, an agent with the New Jersey Division of Fish, Game, and Wildlife, testified that approximately three months after the incident plaintiff likewise admitted that during the inspection he had become angry and threatened to kill Norton. *Id.* 163–64.

---

1. All references to Exhibits refer to the administrative record prepared and filed by the Secretary pursuant to 16 U.S.C. § 1858(b).

2. As a result of the inspection, plaintiff received various citations, all of which were reduced or overturned on administrative appeal. These issues are not relevant to the present action.

3. Eisenhuth testified that while he was still measuring the fish plaintiff made the threat. *See* Tr.

8/30/90, at 144–45. Plaintiff testified that Eisenhuth finished measuring the fish, left the vessel to confer with the USCG, then returned and informed plaintiff that the catch would be seized, not as undersized, but because plaintiff had been dragging nets illegally. According to plaintiff, Norton then laughed at him and provoked plaintiff's outburst. *Id.* 194–97.

Persons present during the inspection later testified to the effect of plaintiff's conduct. Eisenhuth testified that he had been bending over measuring fish when plaintiff made the threat, and as a result he "put the fish board down and stood up and observed Mr. Vance and Mr. Diehl, anticipating perhaps, something more was going to happen." *Id.* 151. He further testified:

> Based on past boardings and other experience in inspecting sportsmen and commercial fishermen, this situation was not a normal situation in that there were—Mr. Diehl continued to carry on throughout my inspection, this is for a period of time, not just a short period of time and it was cause enough for me to stop my inspection, watch Mr. Diehl just to see if anything else was going to happen.
>
> That's normally not the case on fisheries inspections. Normally the captains and the mates, whatever stand by while you measure fish, and there is normal[ly] not that much hostility and if there is, it usually stops rather quickly.

*Id.* 152–53. Pechacek testified as follows:

> [Plaintiff's threat] automatically raises the tensions, it automatically raises the amount of—I really don't know what word to put it in, it's a—it makes everybody nervous and it makes things start going really rough. And it's not what you need, it, it can go calm or it can go completely out of control. And that's not what you want to happen.

*Id.* 74. In Griffin's words,

> After the threats were made toward Petty Officer Norton, it kind of gave a more stressed attitude towards the boarding. He raised the stress level of all the individuals involved in the boarding to the point where we were more worried about Mr. Diehl doing something violent toward the boarding party and we had to pertain more to that than finishing up the boarding. It took longer to finish up the boarding because of that.

*Id.* 123–23A.

After plaintiff's outburst, several USCG members came to the scene, and a superior ordered Norton to leave the area. *Id.* 29,

175, 196. Eisenhuth took ten or fifteen more minutes to complete his inspection. *Id.* 152. When Eisenhuth was finished, Pechacek signed a USCG Form 4100 Report of Boarding (Ex. 49) and gave it to plaintiff. *Id.* 72. Plaintiff and Vance then left the dock in the F/V MISS JEAN.

On May 24, 1989, an agent from NOAA completed an Enforcement Action Report concerning the event, indicating that plaintiff had "intimidated and interfered with an authorized officer in the conduct of a lawful fisheries inspection." (Ex. 43) On September 7, 1989, a NOAA enforcement attorney issued a Notice of Violation and Assessment (NOVA) charging plaintiff with violating section 307(1)(A) of the Act, 16 U.S.C. § 1857(1)(A), and an implementing regulation, 50 C.F.R. § 625.7(b)(4), which makes it unlawful to "interfere with, obstruct, delay or prevent by any means the lawful investigation or search in the process of enforcing [50 C.F.R. part 625]." The NOVA indicated that NOAA would assess a $10,000 penalty. (Ex. 2)

Consistent with the NOVA, on September 18, 1989, plaintiff requested an administrative hearing. (Ex. 3) By Notice and Order dated October 6, 1989, plaintiff and the agency were directed to submit a "preliminary position on issues and procedures" ("PPIP") in accordance with 15 C.F.R. § 904.240(a). (Ex. 5) Plaintiff's counsel submitted his PPIP on November 2, 1989, indicating *inter alia,* under the heading "opposition to penalty," the following:

> Based upon the fact that Respondent denies any violation of the [Act] as set forth in the [NOVA], Respondent does not direct himself to the issue of penalty at this time. However, Respondent reserves the right to be heard pursuant to 15 CFR 904.108.

Ex. 6. The agency also submitted a PPIP, indicating that it believed the $10,000 penalty reasonably reflected the gravity, nature, and circumstances of the alleged violation. The agency also stated:

> The Respondent has not asserted that he is unable to pay the civil penalty assessed in the NOVA, and has made no showing regarding his ability to pay as required by

the Ability to Pay regulations at 15 CFR 904.108.

Ex. 7.

On August 30, 1990, an administrative law judge (ALJ) conducted a hearing in Wall, New Jersey. The substance of the testimony given at the hearing is set forth above. The parties received transcripts of the hearing and pursuant to 15 C.F.R. § 904.261 thereafter submitted to the ALJ post-hearing briefs containing proposed findings of fact and conclusions of law. (Exs. 29–31) In an initial decision dated May 31, 1991, the ALJ concluded that the agency had proven a violation by a preponderance of the evidence. On the appropriate penalty, the ALJ wrote:

> Having taken into account the nature, circumstances, extent of gravity of the violation committed by the Respondent, his degree of culpability, the absence (presence) of prior enforcement proceedings, his ability to pay as well as other information of record, I conclude that a civil penalty of $10,000 is appropriate.

Ex. 32.

On June 13, 1991, plaintiff filed a petition for reconsideration addressed solely to the penalty imposed, asserting that it was not based upon any evidence relevant to his ability to pay and requesting that the ALJ take further evidence on the factors set forth in 15 C.F.R. § 904.108. (Ex. 34). On June 20, 1991, the ALJ denied the petition, stating in part, "These are not bifurcated proceedings. Respondent has had his 'day in Court' to present all evidence and arguments." (Ex. 35) Plaintiff also filed with NOAA a petition for discretionary review pursuant to 15 C.F.R. § 904.273.[4] (Ex. 38) On August 22, 1992, NOAA denied the petition, at which point the agency action became final. *See* 15

C.F.R. § 94.273(i). This timely action followed. *See* 16 U.S.C. § 1858(b) (action for review must be brought within thirty days of receipt of agency's denial of discretionary review).

On October 6, 1992, the Court convened a telephone conference and established a schedule for filing the agency record and briefs.[5] On November 13, 1992, the defendant answered and counterclaimed for payment of the $10,000 penalty. Defendant thereafter moved for summary judgment dismissing the complaint and granting the counterclaim. Plaintiff then cross-moved to dismiss the counterclaim. The Court now reviews the agency action, and this review resolves the various motions.

## DISCUSSION

### A. *Standard of Review*

The Court exercises plenary review of questions of law, but it will not overturn findings of fact if there is substantial evidence in the record, considered as a whole, to support them. *See* 16 U.S.C. § 1858(b) (court to apply substantial evidence standard of Administrative Procedure Act, 5 U.S.C. § 706(2)); *Lovgren v. Byrne*, 787 F.2d 857, 862 (3d Cir.1986). In reviewing the ALJ's decision, the Court must determine whether there is, in the record as a whole, "such relevant evidence as a reasonable mind might accept as adequate to support [his] conclusion[s]." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *see American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 522, 101 S.Ct. 2478, 2497, 69 L.Ed.2d 185 (1981). It is not significant that alternative findings might also be supported by substantial evidence. *See Arkansas v. Oklahoma*, —— U.S. ——,

---

4. A party must file the petition for review within 30 days of the initial decision. 15 C.F.R. § 904.-273(a). It is not clear from the record when plaintiff filed his petition for discretionary review. The unsigned petition in Exhibit 38 is dated June 15, 1991, but the accompanying cover letter is dated April 8, 1992. In his June 13, 1991, petition for reconsideration filed with the ALJ, plaintiff indicated that he already had filed the petition for discretionary review. *See* Ex. 34, ¶ 2. The agency filed its opposition to the petition for discretionary review on August 2, 1991. (Ex. 39) NOAA's denial of the petition is dated August 24, 1992, and does not mention the time-

liness of the petition. Because the agency has not challenged the timeliness of the petition, and because an untimely request would not affect the Court's jurisdiction, *see* 16 U.S.C. § 1858(b), it is not necessary to resolve the issue.

5. Upon filing, this case was assigned to Judge Parell. Because of its close relation to another case, *Yahara v. Franklin*, Civ. No. 92–4083 (GEB), the Court ordered it reassigned to this judge and established a coordinated briefing and argument schedule.

——, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992). Rather, to reverse the decision, the Court must conclude that an alternative finding is compelled by the evidence. *See INS v. Elias–Zacarias,* —— U.S. ——, —— & n. 1, 112 S.Ct. 812, 815 & n. 1, 117 L.Ed.2d 38 (1992).

Plaintiff sets forth six causes of action in his complaint,[6] but in substance they reduce to two issues: whether he violated the Act by interfering with an investigation, and whether the $10,000 penalty is justified. The Court addresses these issues in turn.

### B. *Interfering With Inspection*

Plaintiff argues (1) that his conduct did not amount to interference, and (2) that, even if it did, there was no interference with an investigation in the process of enforcing the federal regulations pertaining to summer flounder (50 C.F.R. part 625).

■ Addressing the second argument first, the Court finds that it is without merit. Essentially, plaintiff claims that the USCG initially boarded the F/V MISS JEAN pursuant to authority deriving from a general inspection statute, 14 U.S.C. § 89(a), and that the subsequent investigation therefore was not in the process of enforcing part 625. However, he overlooks the fact that aboard the F/V MISS JEAN he had 250 pounds of summer flounder—a species regulated by 50 C.F.R. part 625—and that Eisenhuth, although a state inspector, also was deputized to ensure compliance with federal regulations. Plaintiff relies on testimony to the effect that Eisenhuth was only measuring the fish for compliance with state standards. *See* Tr. 8/30/90, at 46, 59 (Norton testifying that Eisenhuth was called to do the inspection because it was thought plaintiff had been fishing in state waters); *id.* at 144 (Eisenhuth testifying, "I proceeded to measure the fish for compliance with New Jersey law."); *id.* at 194 (plaintiff testifying that Eisenhuth

was measuring for compliance with state standards); *see also id.* at 145 (Eisenhuth testifying that in May 1989 he did not believe summer flounder were subject to federal regulation). But Eisenhuth also testified, "When I do inspections, I look for state and federal violations." *Id.* 147. Also, as of October 1988, summer flounder were subject to federal regulation. *See* 53 Fed.Reg. 39477 (1988) (adopting regulations now appearing at 50 C.F.R. part 625). Moreover, plaintiff himself testified that someone, if not Eisenhuth, measured the flounder for compliance with federal regulations. *Id.* 194. Therefore, there is substantial evidence in the record, taken as a whole, to support the conclusion that at least one purpose of the investigation was to enforce federal part 625, the regulations pertaining to summer flounder.

Plaintiff also suggests that he cannot be liable for interfering with the investigation unless his outburst occurred while the object of the investigation was enforcement of the federal regulations. In plaintiff's view, the investigation should be broken down into discrete stages, *e.g.,* investigation for compliance with safety regulations, investigation for compliance with federal size limits, and investigation for compliance with state size limits. There is no merit to this position, for the investigation must be considered as a totality. The USCG members testified that a boarding is not considered completed until a signed boarding report is given to the vessel master and the vessel is released. *See* Tr. 8/30/90, at 28–29, 123, 130–31, 133, 137, 138. Plaintiff did not receive the boarding report until after his outburst. Eisenhuth testified that at the time of the outburst he "was still in the process of measuring the fish and also [he] still wanted to talk with the Coast Guard personnel as to their earlier observations to complete [his] investigation." *Id.* 145.

■ The real issue, then, is whether there is substantial evidence to support the ALJ's

---

**6.** Plaintiff asserts the following causes of action: (1) that there is no substantial evidence to support either the finding of liability or the $10,000 assessment; (2) that the ALJ failed to comply with the Administrative Procedures Act ("APA") APA by failing to consider statutory factors in setting the penalty; that the ALJ violated (3) the APA and (4) the Due Process Clause by assessing the penalty without hearing plaintiff on the issue of ability to pay; and (5) that the ALJ lacked jurisdiction because plaintiff's conduct occurred during a state investigation of plaintiff's catch, not a federal investigation. In count six, plaintiff seeks a stay of agency efforts to revoke or suspend his fishing license or to condemn his vessel pending the outcome of this action.

conclusion that plaintiff's conduct amounted to interference with the investigation. The Court finds that there is. As stated in a leading case, affirmed by the Third Circuit,

> The policeman's lot may not be a happy one, but it may not be made more miserable by hysterical and threatening outbursts, particularly when reasonable and legitimate inquiries are made.

*In re Gosta (Swede) Lovgren,* 3 Ocean Resources and Wildlife Reptr. (hereafter "ORW") 431, ___ (NOAA1984) (1984 WL 60193, 1984 NOAA Lexis 87, *15), *pet'n for rev. denied,* 3 ORW 564, 1984 WL 60216 (NOAA App.1984), *aff'd,* Civ. No. 84–2436 (MTB) (D.N.J. Jan. 24, 1985), *aff'd,* 787 F.2d 857 (3d Cir.1986); *see also In re Hedger,* 5 ORW 478, ___ (NOAA1989) (1989 WL 265336, 1989 NOAA Lexis 10, *16) ("[I]t is not appropriate for citizens to harass, threaten, or intimidate those who enforce the law."); *see, e.g., In re Goldman,* 6 ORW 413 (NOAA1991) (1991 WL 288735, 1991 NOAA Lexis 23); *In re Silva,* 6 ORW 404 (NOAA1991) (1991 WL 288729, 1991 NOAA Lexis 22); *In re Hedger,* 5 ORW 478 (NOAA1989) (1989 WL 265336, 1989 NOAA Lexis 10; *In re Picciandra,* 4 ORW 456 (NOAA1985) (1985 WL 69264, 1985 NOAA Lexis 5), *pet'n for review denied,* 4 ORW 514, 1986 WL 80176 (NOAA App.1986). The question whether Diehl's conduct interfered with, obstructed, or delayed the investigation is one of fact. There was ample testimony, summarized above at pages 3 and 5, about the nature and effect of plaintiff's conduct, *e.g.,* that it was rude, belligerent, threatening, and distracting. The USCG and fisheries personnel have important, often difficult, and sometimes dangerous duties to perform in the national interest. Masters of vessels cannot be allowed to interfere with inspections with threats and intimidation. Plaintiff's statements and actions caused stress and apprehension of violence and interfered with a lawful inspection. Thus, the Court will affirm the ALJ's finding that plaintiff violated the law and was subject to penalty.

### C. *The $10,000 Penalty*

■ In reviewing the penalty imposed on plaintiff, the Court applies an abuse of discretion standard. *Lovgren,* 787 F.2d at 867. Under this standard, the amount of the penalty "will not be disturbed unless there is a definite and firm conviction that the [ALJ] committed a clear error of judgment in the conclusion [he] reached upon a weighing of the relevant factors." *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 952 F.2d 44, 48 (3d Cir.1991) (internal punctuation and citations omitted). Congress has authorized fines of up to $100,000 for each violation of the Act.[7] The Act provides that in determining the amount of a penalty, the decisionmaker "*shall* take into account the nature, circumstances, extent, gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, *ability to pay,* and such other matters as justice may require." 16 U.S.C. § 1858(a) (emphases added).

Plaintiff argues that the ALJ erred by not considering plaintiff's ability to pay a $10,000 fine. Plaintiff asserts that he reserved the issue in his PPIP and that the ALJ should have taken further evidence after the finding of liability, or at least have given notice before the hearing that he would not consider evidence submitted after the hearing on liability. The agency argues that plaintiff had the burden of establishing financial inability to pay the fine, and if he intended to have this factor considered he was required to submit the financial information in the PPIP.

■ The regulations support the agency's position.[8] However, the regulations may

---

7. An amendment to the Act in November 1990 increased the maximum penalty from $25,000 to $100,000. *See* Fishery Conservation Amendments of 1990, Pub.L. No. 101–627, § 114(a)(2), 104 Stat. 4436, 4454.

8. The regulations provide:
   (c) If a respondent asserts that a penalty should be reduced because of an inability to pay, *the respondent has the burden of proving* *such inability* by providing verifiable, complete, and accurate financial information to NOAA. NOAA will not consider a respondent's inability to pay unless the respondent, upon request, submits such financial information as Agency counsel determines is adequate to evaluate the respondent's financial condition.... If the respondent does not submit the requested financial information, he or she will

not be contrary to the Act, and to the extent that they place on plaintiff the burden of going forward with evidence of inability to pay, as set forth below the Court finds that they are contrary to Congress's unmistakable command that the agency bears the burden. *See* 5 U.S.C. § 556(d). Moreover, to the extent that the ALJ had before him no evidence on plaintiff's financial ability to pay the penalty, his determination of the penalty could not have complied with the Act, which directs that he "shall take into account" that factor. 16 U.S.C. § 1858(a).

The Act states that hearings on charges of civil violations must comply with section five of the Administrative Procedure Act ("APA"), 5 U.S.C. § 554. Section 554 applies, with a few minor exceptions not applicable here, "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing...." 5 U.S.C. § 554(a).[9] Where the parties are unable to settle a controversy by consent, all interested parties are entitled to a hearing and decision in accordance with APA sections 556 and 557. *Id.* § 554(c)(2). Section 556 provides in part, "Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof." *Id.*

§ 556(d). Because the Act does not create an exception to this scheme, it was the agency, not plaintiff, who had to come forward with evidence of plaintiff's ability to pay a fine. *See Merritt v. United States,* 960 F.2d 15, 18 (2d Cir.1992); *Bosma v. United States Dep't of Agric.,* 754 F.2d 804, 810 (9th Cir. 1984). The agency failed to meet its burden, as the ALJ recognized in his initial decision, where he noted, "The record contains no substantive information respecting the Respondent's ability to pay." Ex. 32, at 6.

In light of the ALJ's own assessment of the record before him, the Court concludes that he could not have considered plaintiff's ability to pay the penalty, notwithstanding the ALJ's recitation that he did consider this necessary factor. *See id.,* at 6–7 ("Having taken into account ... [plaintiff's] ability to pay ..., I conclude that a civil penalty of $10,000 is appropriate."). Because the Act states that a person's ability to pay "shall" be considered in fixing the penalty, the Court finds that the $10,000 penalty amount is arbitrary and capricious and must be set aside.[10] *See Frisby v. United States Dep't of Hous. & Urban Dev.,* 755 F.2d 1052, 1055 (3d Cir. 1985); *see also Shane Meat Co. v. United*

be presumed to have the ability to pay the penalty.

....

(e) Financial information regarding respondent's ability to pay should be submitted to Agency counsel as soon after receipt of the NOVA as possible. *If a respondent has requested a hearing on the offense and wants his or her inability to pay considered in the initial decision of the Judge, verifiable financial information must be submitted to Agency counsel at least 15 days in advance of the hearing. ...* (f) Issues regarding ability to pay will not be considered in an administrative review of an initial decision if the financial information was not previously present by the respondent to the Judge at the hearing.

15 C.F.R. § 904.108(c), (d), (e) (emphases added).

9. "The APA ... does not itself mandate that a trial-type hearing be held where none is required under the administrative agency's own governing statute; the APA simply dictates the procedures to be followed when another statute provides for a hearing." *Gallagher & Ascher Co. v. Simon,* 687 F.2d 1067, 1072 (7th Cir.1982); *see Sisselman v. Smith,* 432 F.2d 750, 754 (3d Cir.1970). By its own terms, APA § 554 applies only where the agency's governing statute requires adjudication "to be determined on the record" after a

hearing. The Act does not require a "hearing on the record" before imposition of civil penalties, and in a rule-making case under APA § 553 the Supreme Court has found the absence of the words "on the record" in a statute to be determinative of whether a party is entitled to the procedural protections of APA §§ 556 and 557. *See United States v. Allegheny–Ludlum Steel Corp.,* 406 U.S. 742, 757, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453 (1972). The Supreme Court did not hold, however, that only the words "on the record" in will suffice to make APA §§ 556 and 557 applicable, *id.,* and Congress explicitly directed that assessment of penalties under the Act must comply with APA § 554. Moreover, the penalty assessment process is adjudicative in nature and implicates substantial property interests. Therefore, the Court finds that the procedures outlined in APA § 554, which incorporate the procedures of APA §§ 556 and 557, govern the penalty assessment process under the Act. *See generally* 2 Kenneth Culp Davis, *Administrative Law Treatise,* § 12:10 (2d ed. 1979).

10. Having decided the issue on statutory grounds, the Court does not reach plaintiff's arguments that the proceedings violated the Due Process Clause of the Constitution.

*States Dep't of Defense,* 800 F.2d 334, 339 (3d Cir.1986).

The Court does not approve of plaintiff's counsel's attempt to bifurcate the administrative proceeding. Counsel was well aware of the ordinary conduct of NOAA hearings; his November 2, 1989, PPIP refers to 15 C.F.R. § 904.108. Nonetheless, these tactics do not relieve the agency of its burden of proof. As the Second Circuit recently stated, "[The statute] makes clear that the [agency] must consider ability to pay before it imposes a fine. It makes no exception for defendants who refuse to cooperate with the [agency]." *Merritt,* 960 F.2d at 18.[11] In addition, both the agency and the ALJ have means to prevent this kind of problem. If a respondent refuses to provide financial information, the agency may seek to compel its production, and the ALJ may, in addition to ordering the respondent to produce the information, issue an order to show cause why the respondent should not be barred from asserting financial hardship. *See* 15 C.F.R. §§ 904.212(i); 904.-212, 904.240(a), 904.244(a). Such steps are preferable to those taken here, i.e., not to acknowledge plaintiff's reservation of the financial inability issue and then to rule, after the close of the record, that such reservation would not be allowed.

To be sure, a respondent should not be permitted to dictate when the agency record will close. *See Merritt,* 960 F.2d at 18 (citing *ICC v. Jersey City,* 322 U.S. 503, 514–15, 64 S.Ct. 1129, 1134–1135, 88 L.Ed. 1420 (1944)). Thus, the Second Circuit found in *Merritt* that the respondent—who refused to cooperate with the agency, attempted to delay the administrative proceedings, and waited until after the close of the record before requesting a hearing on ability to pay—was not, on remand, entitled to a hearing on the issue. Here, where plaintiff attempted to reserve his right to a hearing on ability to pay and cooperated in all other respects with the agency during the hearing process, it is no injustice to the agency to require a hearing on the ability to pay question. Therefore,

the Court will remand the matter for redetermination of the penalty.

## CONCLUSION

For the foregoing reasons,

It is this 15th day of July, 1993,

ORDERED that plaintiff's motion to dismiss the counterclaim for payment of the $10,000 penalty be and is hereby GRANTED; and it is

FURTHER ORDERED that defendant's motion for summary judgment be and is hereby DENIED with respect to defendant's counterclaim, DENIED with respect to counts one (insofar as it concerns the amount of the penalty), two, three, and six of plaintiff's complaint, and GRANTED with respect to counts one (insofar as it concerns the finding of liability) and five of plaintiff's complaint; and it is

FURTHER ORDERED pursuant to 16 U.S.C. § 1858(b) that the finding that plaintiff interfered with a lawful investigation under the Magnuson Act be and is hereby AFFIRMED but the assessment of the $10,-000 civil penalty be and is hereby VACATED AND REMANDED for a hearing and reassessment not inconsistent with this Memorandum and Order.

---

11. *Merritt* dealt with section 13(c) of the Shipping Act, 46 U.S.C.A. app. § 1712(c), which contains language identical to § 1858(a) of the Act, except it uses the term "Commission" instead of "Secretary." Mr. Merritt refused to participate at all in the agency proceedings, and then sought judicial review.